CASE 72.—PROSECUTION AGAINST CHARLES TIBBS FOR MURDER.—June 1, 1910.

## Tibbs v. Commonwealth.

Appeal from Bell Circuit Court.

W. T. Davis, Circuit Judge.

Defendant convicted and appeals.—Reversed.

1   Homicide—Evidence— Dying Declarations— Admissibility.— The declarations of decedent, voluntarily made while sane, when in articulo mortis and under the solemn conviction of approaching dissolution, concerning the circumstances constituting the res gestae, are admissible in evidence, provided decedent would be a competent witness if living.

2   Homicide—Evidence— Dying Declarations— Admissibility.— After the assault on decedent, he was taken to an adjoining house, where after stating that he did not think he would get well, but expected to die, he detailed the circumstances of the tragedy, and claimed accused was the man who cut him. He kept his clothes on and subsequently wandered about the house, and also went to an adjoining house, where he stated in the presence of witnesses that the as-

Tibbs. v. Commonwealth.

sault amounted only to a black eye, which would last for a few days, after which he was up and down during the day with his clothes on, and next morning went unassisted to the station to take the train to his home, where he himself called a doctor. Held, that his actions did not show that he did not expect to live, and his statement was not admissible as a dying declaration.

3. Homicide—Dying Declarations—Danger and Imminence of Death.—Evidence was admissible to show that the wound inflicted was not calculated to endanger or destroy decedent's life, and that he died solely from improper treatment.

4. Criminal Law—Appeal—Review—Instructions.—Where there was evidence tending to show that accused was a somnambulist, and while in such state was without self-control, and committed acts of which he had no recollection, which facts would not constitute any defense other than that embraced in a plea of insanity, accused could not complain that he was given the benefit of a charge submitting the question of his insanity.

H. B. JONES and J. B. BURNETT for appellant.

JAS. BREATHITT attorney general and TOM B. McGREGOR assistant attorney general for Commonwealth.

OPINION OF THE COURT BY COMMISSIONER CLAY—Reversing.

Charley Tibbs was indicted and tried for murder. The jury found him guilty, and fixed his punishment at confinement in the penitentiary for life. From the judgment of conviction, he prosecutes this appeal.

The facts in brief are as follows: Appellant was a blacksmith in the employ of the Ralston Coal Company, a corporation engaged in business near the Tennessee line. He started from that company's place of business for Tazwell, Tenn. In going there it was necessary for him to pass through the city of Middlesborough and remain overnight. Early in the evening preceding the morning when the deceased, Charlie Haynes, was wounded, appellant met deceas-

ed.    Some time later they were joined by Ernest
Withrow.  These parties first visited one saloon, then
another.   They drank a quantity of beer and whisky.
About 9 o'clock they proceeded to a house of ill fame
kept by Julia Elliott.   There they met a man by the
name of T. C. Anderson.  The occupants of the Elliott
house were   Julia Elliott and her daughters, Clody
Sounders, and Fannie Bates.   After remaining at
this house a while, appellant and his companions went
uptown.   They again visited several saloons.   About
midnight they returned to Julia Elliott's.   While in
the house, Anderson let the deceased have $2.   The
deceased shook the money in his hands for the pur-
pose of teasing one of the inmates.   Appellant said
to deceased:  "Charlie, let me have that money. I
will spend it with them."   This the deceased declined
to do, and at the same time handed the $2 back to
Anderson.   According to two of the witnesses pres-
ent,   the   appellant said, addressing the deceased:
"God damn you, I will   settle with you before day-
light," or "God damn you, I will get even with you
before to-morrow."   Other witnesses present claim
no such remark was made by appellant.   Very soon
appellant and his companions were ordered to leave
the Elliott house.  This they did.  As they were leav-
ing, one or two of the witnesses claim that appellant
drew his pistol and made the statement that he was
going to shoot back into the house through the win-
dow.  This is denied by other witnesses.  After going
out of the house, appellant lay on the ground and
went to sleep.    The deceased, with Anderson   and
Withrow, went to the next house, some 50 or 60 feet
away, kept by Nellie Carroll.   There they remained
for quite a while.  Upon leaving the Carroll house,
they went to appellant for the purpose of waking him.

Anderson says their object was to take appellant to the train which left early that morning. Other. witnesses claim that it was for the purpose of taking appellant into the Carroll house to be cared for. When the deceased attempted to wake appellant, and they started in the direction of the Carroll house, appellant, according to Anderson's testimony, arose from the ground and struck deceased with his fist, but immediately apologized for so doing, at the same time shaking hands with the deceased. After some further conversation and after they had walked a few steps in the direction of the Carroll house, the deceased said: "It is all over, now; but you have hurt me, and hurt me bad." Appellant replied that he would hurt him still worse. At the same time he drew his knife from his pocket, and struck deceased over the eye. He struck at the deceased a second time, but missed him. Anderson, who testified to the foregoing facts, claims that he then struck appellant with his fist and kicked him three or four times on the face and jaw, finally knocking him down and away from deceased. Appellant then arose, and Anderson chased him about 125 yards. Upon returning to the deceased, Anderson found a stranger near him. He asked deceased if that was the man who struck him. The deceased replied that it was not; that Charley Tibbs was the man who cut him. The next morning appellant was found behind a blacksmith shop by one Andrew Jackson. The latter persuaded appellant to go into the shop and lie down on a buggy cushion. Appellant remained there until Monday morning. This witness claims that when he aroused appellant, the latter said: "O Lordy, Andy, I expect I done something last night that will get me in trouble."

The testimony for appellant is to the effect that he had absolutely no recollection of any difficulty with the deceased. He remembered taking several drinks, and that he left the Elliott house. Following that he remembered nothing until awakened by Jackson.

Shortly after the deceased was cut, which occurred about 4 o'clock on Sunday morning, he went into the house kept by Nellie Carroll. There the wound was washed and tied up with an old rag. Dr. Evans, who passed the Carroll house about 7 o'clock, was called in. He examined the wound, and did not consider it fatal. Deceased remained at the Carroll house all day and until the next morning. He then went to the station, about a half mile distant, unattended. From there he took a train to Tazwell, Tenn. During all this time there was no one with him. After reaching his home at Tazwell, a local physician was called in, and the wound again dressed. A member of the faculty of Tennessee Medical College, of Knoxville, was sent for, and he came and operated upon deceased. According to his testimony, the skull was fractured. The deceased gradually grew worse, and died a few days later from blood poison. According to one of the physicians, who testified for appellant, the skull was not fractured.

In view of the fact that we have concluded that the judgment must be reversed for other reasons, we deem it unnecessary to determine whether or not the court erred in refusing to grant appellant a continuance. The other two errors relied upon are the admission of the dying declarations of the deceased and the failure of the court to permit appellant to introduce evidence to the effect that the wound was not of itself dangerous—that is, caluculated to endanger or destroy life—and that the deceased died from the

effect of improper treatment. Nellie Carroll stated
that deceased, after making the statement that he did
not think he would get well, but expected to die, de-
tailed the circumstances of the tragedy, and claimed
that appellant was the man who cut him. Another
witness corroborates this statement of Nellie Carroll.
It appears, however, that the deceased kept his
clothes on and wandered about the Carroll house, and
also went over to the adjoining premises owned by
Julia Elliott. There he said, in the presence of two
witnesses: ''Look what that damned son of a bitch
has done. It will only be a black eye for a few days.''
After this conversation, he walked about for some
time, and was up and down during the day, with his
clothes on. The next morning' he went, unassisted,
to the station in Middlesborough for the purpose of
taking the train to his home. After landing at old
Tazwell, Tenn., he himself called a doctor. Were the
declarations of the deceased, made under these cir-
cumstances, admissible as dying declaration? It is
well settled that, in prosecutions for homicide, the
declarations of the deceased voluntarily made, while
sane, when in articulo mortis, and under the solemn
conviction· of approaching dissolution, concerning
the facts and circumstances constituting the res gestae
of his destruction, are always admissible in evidence,
provided the deceased would be a competent wit-
ness if living. The general principle upon which this
species of evidence is admitted is that they are decla-
rations made in extremity, when the party is at the
point of death and when every hope of this world is
gone, when every motive of falsehood is silenced, and
the mind is induced by the most powerful considera-
tions to speak the truth; a situation so solemn, and
so awful, being considered by the law as creating an

obligation equal to that which is imposed by a posi-
tive oath administered in a court of justice. 21 Cyc.
974-976; Walston v. Commonwealth, 16 B. Mon. 15;
Kelly v. Commonwealth, 119 S. W. 810. Considered
in the light of these principles, we conclude that the
alleged dying declarations of the deceased were not
made with a sense of impending dissolution. We do
not attach so much importance to the fact that it was
several days before he actually died, but to the fact
that, aside from his statement that he did not expect
to live, all his other  conversations and acts go to
show the contrary. The very fact that he was dressed
and visited first one house and then another, that he
used the expression attributed to him in the Elliott
house, that he arose the next morning and without
assistance went to the train, knowing that he would
have to travel several miles on the train, and then
ride in a hack for a mile and a half without any one
to look after him, precludes the idea that his alleged
dying declarations were made with a solemn convic-
tion of approaching death. That being the case,
we are of opinion that the court erred in permitting
such declarations to go to the jury.

We also conclude that the court erred in refusing
to permit  appellant to show, if he could, that the
wound was  not calculated  to endanger or destroy
life, and that  deceased died  solely from  improper
treatment. The rule in this state is contained in the
following language from the case of Bush v. Com-
monwealth, 78 Ky. 268: "As said in Commonwealth
v. Hackett, 2 Allen [Mass.] 141, the rule of the com-
mon law would seem to be that if the wound was a
dangerous wound—that is, calculated to endanger or
destroy life—and death ensued therefrom, it is suf-
ficient proof of murder or manslaughter, and that

the person who inflicted it is responsible, though it may appear that the deceased might have recovered if he had taken proper care of himself, or submitted to a surgical operation, or that unskillful or improper treatment aggravated the wound and contributed to the death, or that death was immediately caused by a surgical operation rendered necessary by the condition of the wound. The principle upon which this rule is founded is that every one is held to contemplate and to be responsible for the natural consequences of his own acts. But, if the wound is not dangerous in itself, and death results from improper treatment, or from disease subsequently contracted, not superinduced by or resulting from the wound, the accused is not guilty. 1 Hale's P. C. 428; Parsons v. State, 21 Ala. 301. When the disease is a consequence of the wound, although the proximate cause of the death, the person inflicting the wound is guilty, because the death can be traced as a result naturally flowing from the wound and coming in the natural order of things; but when there is a supervening cause, not naturally intervening by reason of the wound, and not produced by any necessity created by the wound, the death is by the visitation of Providence and not from the act of the party inflicting the wound. In the case under consideration, the fever was not the natural consequence of the wound, nor was it produced by any necessity created by the infliction of the wound. It did not render it necessary to have the wound treated by a physician just recovering from the scarlet fever, even if it be conceded that medical treatment was necessary at all. If the death was not connected with the wound in the regular chain of causes and consequences, there ought not to be any responsibility. If a new and wholly inde-

pendent instrumentality interposed and produced death, it cannot be said that the wound was the natural or proximate cause of the death. 14 Grat. [Va.] 601, Livingston v. Commonwealth.'' Upon the next trial of the case, the court will permit appellant to introduce evidence, if he can do so, tending to show that the wound was not calculated to endanger or destroy life, and that the death of the deceased was caused solely by improper treatment. If appellant succeeds in introducing such evidence, the court will, in addition to the instructions given on the former trial, instruct the jury that, if they believe from the evidence beyond a reasonable doubt that the defendant, not in his necessary or to him apparent necessary self-defense, cut and wounded the deceased, but further believe from the evidence that the wound inflicted by defendant, if he did inflict it, was not calculated to endanger or destroy the life of the deceased, and that the death of the deceased resulted solely from the improper treatment of the wound, then they should find the defendant guilty of willful and malicious cutting and wounding, if they believe that the cutting and wounding was willfully and maliciously done with the intent to kill the deceased, as provided by section 1166 of the Kentucky Statutes; but, if they believe that the cutting and wounding was inflicted in sudden heat and passion, without previous malice, they should find the defendant guilty of cutting and stabbing in sudden affray, as provided by section 1242, Ky. St.

The court will designate the above instruction No. 3. In lieu of instruction No. 3, as given, it will further instruct the jury that manslaughter is a lesser offense than murder, malicious wounding is a lesser

offense than manslaughter, and cutting in sudden affray is a lesser offense than malicious wounding; and, if the jury believe beyond a reasonable doubt that he is guilty as defined in No. 1, No. 2, or No. 3, but have a reasonable doubt as to the degree of the offense, they will find him guilty of the lesser offense as to which they have no reasonable doubt.

Complaint is made of the fact that the court submitted to the jury the question of appellant's insanity. Some evidence was admitted on the trial tending to show that appellant was a somnambulist, and while in this state was without self-control, and committed acts of which he had no recollection. We fail to see how these facts would constitute any defense other than that embraced in a plea of insanity. Certainly the appellant cannot complain that he was given the benefit of such defense.

Judgment reversed and cause remanded for a new trial consistent with this opinion.