## Crum v. Commonwealth.

(Decided February 26, 1932.)

JOHN T. REDWINE, M. M. REDWINE, and V. H. REDWINE for appellant.

BAILEY P. WOOTTON, Attorney General, and BASIL P. COOPER, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE PERRY—Affirming.

The appellant, Lem Crum, was indicted March 9, 1931, charged with the willful murder of Ray Flannery, and having been tried on this indictment in the Elliott circuit court July 17, 1931, he was convicted of voluntary manslaughter, and his punishment fixed at seven years' confinement at hard labor in the state reformatory at Frankfort. From this judgment pronounced on that verdict, his motion and grounds for a new trial being overruled, he prosecutes this appeal, and by counsel urges two grounds for reversal: (1) That the verdict is not supported by sufficient evidence; and (2) the admission in evidence of deceased's statement of the circumstances of defendant's shooting deceased, as his dying declaration, was without proper preliminary foundation.

We will consider and dispose of these assignments of error in the order presented.

First, appellant contends that the verdict was not supported by the evidence.

It is shown by the evidence herein that Ray Flannery, a single man, 22 years of age, was shot by the accused, Lem Crum, between sundown and dark on the evening of February 7, 1931, while they were both at the home and upon the premises of Mrs. Polly Conn in Elliott county, Ky., and that Ray Flannery died therefrom about noon of the following day.

The proof for the commonwealth shows that the deceased was shot in the back by the defendant, "about an inch to the right of the backbone at the top of the belt line and the bullet ranged up and cut out at about an inch below the nipple."

It is also shown that the accused, Lem Crum, went to the home of Polly Conn on the evening of the shooting, to see her daughter, Julia, where he found Ray Flannery, who there gave the accused a drink of whisky. A quarrel soon arose between these two suitors of Julia Conn, which resulted in the shooting and killing by the accused of Ray Flannery.

The commonwealth introduced as its witnesses John Flannery and Martha Flannery, father and mother of the deceased, and Laura Conn, Myrtle Conn, and Alice Conn, by each of whom was given in evidence, over the objection of defendant, the statement of the deceased, purporting to give the facts and circumstances under which he was shot and killed by the accused.

The witness, John Flannery, testified that Ray Flannery was his son and a single man about 22 years of age, who had made his home with him for the last several months; that Ray was shot by Lem Crum on Saturday evening, February 7, 1931, between sundown and dark, and died about noon the following day; that at the time of the shooting, Ray Flannery had neither pistol nor knife; that he saw Ray a short time after he was shot, when he was at Laura Conn's, and Ray told him on different occasions there that night and the next day that "he would not get well"; when he further told him that "he had gone to Martin Conn's to see Julia Stamper, or Julia Conn, and that the defendant later came there and seemed to be mad because he was there; that he gave him a drink of whisky, when Lem Crum told him to get out, and when he got out into the yard, that Lem Crum fired two shots, and shot his cap off his head, and when he stooped to pick his cap up, Crum shot him in the back; that he was about the gate and stooped down when he

was shot in the back." Also, witness testified that the deceased had been convicted and served a term in the penitentiary for killing George Johnson's boy; that the place where Ray Flannery was both shot and died therefrom was in Elliott county, Ky. He also testified that he was acquainted with the general reputation of his son, Ray Flannery, for "peace and violence," and that it was bad.

Martha Flannery, the mother of the deceased, testified that Ray Flannery had no knife or pistol; that she heard the shots that killed him and went to where he was, and saw his cap on the bed with two holes in it, shot from behind, and identified the cap and shirt which were introduced in evidence and shown to the jury; also, that Ray said several times that "he was killed and could not get well," and repeated his dying statement, which was in substance the same as that given by John Flannery.

Laura Conn testified that Ray Flannery, when shot, came to her house with his cap in his hand; that it had two holes in it from behind, and said that "he was going to die; that Lem Crum had shot him and that he was leaving at the time he was shot"; that she saw Martha Flannery search his clothes for weapons and he had none.

The witnesses Myrtle and Alice Conn, each repeated the dying statement of Ray Flannery in substance as above given by John Flannery, with the addition that he also then said that "if he got well, he would kill Lem Crum." This, his added statement, defendant contends made the whole incompetent as his dying declaration.

The commonwealth's witness George Johnson stated that the defendant, Lem Crum, came to his house the night of the shooting and that he had a pistol and shotgun and told him that he had shot Ray Flannery four times in the breast; that Lem Crum, on that occasion, said Ray Flannery ran his hand in his pocket, but that he did not see any weapon; that when he fired the last shot at him, Ray hollered and ran through the gate.

R. H. Gray, the commonwealth's last witness, states that a few days after the shooting, the defendant, Crum, told him that the reason he shot Flannery was because he ran his hand in his pocket, but he did not see any weapon, though in a later conversation, had two or three

weeks before the trial, defendant told him that Ray was cutting at him at the time he shot him.

The evidence for appellant tended to establish that he shot the deceased in self-defense.

He testified for himself that he went to the house of Polly Conn, where he found her daughter Julia and Ray Flannery; that Ray began to say he was going to kill him, and drew his knife and started towards him, and at the time he was striking at him with a knife and was whirling around, that he shot him in the side; that Flannery went out of the door with his knife in his hand and he saw nothing more of him; that he shot him because he believed Ray was going to kill him. He also testified that the shooting was all done in the Conn house, but admitted there was no blood on the floor and that he did not know nor see where or if the bullets hit the walls of the room. He denied he told either George Johnson or R. H. Gray that he shot Ray Flannery, because he put his hand in his picket.

Polly Conn testified for defendant, and corroborated him in his version of the shooting of Flannery.

Henry Conn testified that he heard Ray Flannery say he intended to kill Lem Crum.

From this resume of the evidence, it is obvious that this was a case for the jury. Appellant does not deny that he intended to shoot Flannery, but claims that he did so when attacked by him and in his necesary self-defense, leaving it thus for the jury to try and decide this issue made of self-defense.

It is clear that the commonwealth presented to the jury ample evidence upon which to support their verdict, and appellant's contention that the verdict is not supported by sufficient evidence cannot be sustained.

Second, the appellant contends that the court admitted error in allowing the commonwealth to introduce in evidence as the dying declaration of the deceased, witnesses' testimony as to deceased's report of the shooting made them shortly before his death. This contention is based upon the ground that Ray Flannery, upon one of the occasions of making a dying statement as to how he was shot, did further state, after saying that he was going to die, that the shot had killed him ''and that he

couldn't get well," that, "if I get well, I will kill Lem Crum." Appellant contends that this statement showed hope and expectation held by the accused, at the time, of recovering and thus his account of Crum's shooting him does not satisfy the legal requirements or preliminary foundation for its admission as his dying declaration; that it should be admissible as his dying statement only if and when made at a time when the declarant was in expectation of certain death and without hope of recovery.

The rule declaring when a statement may be produced in evidence as a dying declaration was clearly stated and well written in Petty v. Commonwealth, 178 Ky. 483, 199 S. W. 20, 21:

"It must be remembered, that the admission of a dying declaration in any case is an exception to the general rules of evidence. Therefore, to bring into operation this exceptional rule, it must appear that the declaration was made in extremity, when the person was at the point of death, and when every hope of recovery was gone, every motive to falsehood was silenced, and the mind was induced . . . to speak the truth; a situation so solemn is considered by the law as creating an obligation equal to that which is imposed by a positive oath administered in a court of justice. R. C. L. 537, sec. 80; Tibbs v. Commonwealth, 138 Ky. 558, 128 S. W. 871, 28 L. R. A. (N. S.) 665. Although it is essential to the admissibility of a dying declaration that it be made under a sense of impending death, it is not absolutely necessary that the declarant express in so many words his apprehension of such death. It is enough if it satisfactorily appears in any mode that the declaration was made under that sanction, whether it be directly proved by the express language of the declarant, or be inferred from his evident danger or the opinions of the medical or other attendants stated to him, or from his conduct or other circumstances of the case, all of which are resorted to in order to ascertain the state of his mind. R. C. L. 545, sec. 92." Also see Parker v. Commonwealth, 180 Ky. 103, 201 S. W. 475; Commonwealth v. Johnson, 158 Ky. 579, 165 S. W. 984.

It has also been held by this court that it is not inconsistent with the rule as declared, supra, that:

"The declarant may, at some period intervening between receiving his wound and his death, entertain hopes of eventual recovery so as to render a declaration made by him at that time incompetent, but it does not necessarily follow that a later declaration, made when that hope was abandoned by him, should also be incompetent, since its competency must be measured by the condition of mind of the declarant at the time of his making the declaration. Hence we have held that a dying declaration, 'made under consciousness of impending death, is not rendered incompetent by subsequent expressions of a hope of recovery.'" Wells v. Commonwealth, 209 Ky. 208, 272 S. W. 389, 391; Charles Lyons & Doll Lyons v. Commonwealth, 216 Ky. 202, 287 S. W. 534, 535; Stewart v. Commonwealth, 235 Ky. 670, 32 S. W. (2d) 29.

Flannery's account of Crum's shooting him, introduced by the commonwealth as his dying declaration herein, over the objection of defendant, was, it appears, made by him several times between his being shot upon Saturday evening and his resulting death about Sunday noon following, and were made by him at times when he realized that the "shot had killed him." although witness states that upon one of those occasions he said, "If I get well, I will kill Lem Crum." However, such momentary hope of recovery, if held by Flannery upon one occasion when he made this statement, would not render incompetent as a dying declaration other statements made by him either previously or afterwards, yet at times when he held no such hope of recovery, for, as stated in Lyons v. Commonwealth, supra,

"The question always is what was the state of his mind at the time he makes the statement, for if he then believes he is facing impending death the theory of the law is that his statement is competent because in such a state of mind there is removed all incentive to tell anything less than the whole truth about the transaction. The fact that he has theretofore since his injury, or may thereafter, be of opinion that he is going to get well, does not change or

574

affect his state of mind if he at the time of making the statement believed death was impending.''

Finding no merit in either of the two contentions relied on by appellant for reversal, the judgment must be, and it is, affirmed.