THE GOVERNMENT OF THE VIRGIN ISLANDS

v.

HUGH SMITH, Appellant

No. 12,982

United States Court of Appeals

Third Circuit

Argued January 26, 1960

Decided May 6, 1960

*See, also, 278 F.2d 169*

213

ALPHONSE CHRISTIAN, Charlotte Amalie, St. Thomas, Virgin Islands, *for appellant*

LEON P. MILLER, United States Attorney, Charlotte Amalie, St. Thomas, Virgin Islands, *for appellee*

Before MARIS, WOODBURY, and FORMAN, *Circuit Judges*

MARIS, *Circuit Judge*

This is an appeal by the defendant, Hugh Smith, from a judgment of the District Court of the Virgin Islands, following a trial without a jury, finding the defendant guilty on both counts of an information charging involuntary manslaughter and sentencing him to imprisonment for a total of six years on the two counts. The evidence presented by the Government was accurately summarized by the trial judge at the conclusion of the trial as follows:

"The prosecution has adduced evidence showing that about seven-fifteen on the 14th day of March of this year, the defendant was stopped by a police officer for the purpose of picking up Mrs. Ramona Warner at Clinton's Market. He drove her to the Food-O-Mat where she received some groceries, either the defendant got them or somebody brought them out, and they proceeded down the Veterans Drive out to Harwood Highway, as Mrs. Warner testified, at a reasonable rate of speed, something to that effect. And as they approached the light at Sub Base, the defendant speeded up the car. The light was green and she thought he was trying to beat the light, but he kept going faster and faster; that the car did swerve a little bit before they passed Mr. and Mrs. Corneiro, which is between the Nisky Church and Cancel's place. They were going thirty miles per hour and both of them testified that he must have been going twice as fast or at least sixty miles an hour. He cut in sharply on them then proceeded along the Harwood Highway over the top of the hill and jumped the sidewalk, struck two ladies, killing one instantly and injuring the other one severely and she died a few days later in the hospital. The car plowed into a cement wall, traveled two hundred feet more or less from the time he jumped the curb and ended up in the midst of a barbed wire fence. It seems that the horn was blowing on the car and Mrs. Warner got out and went across the street to Tropical Motors. Her head was bleeding and she talked to a young man there. She talked to Mr. Villa, whom she met.

"The defendant was seen with one hand on the wheel and another hand working down toward the dash board. No one knows exactly what he was doing. One witness testified that he thought he was trying to stop the horn from blowing. When he got out of the car it had stopped and another one said it hadn't. Anyway, he got out of the car and a witness testified that he saw him at the back of the car, saw a man at the back of the car. He walked across the street then ran, trotted, it was demonstrated, going in the same direction that he had been coming from in the car.

"Mr. Villa testified that he saw him get out of the car. He was asked about his looks, how did he appear, and he said he appeared a little 'sheepish. He didn't say anything.' And then the women were removed. The police came and investigated and so forth. That essentially is the prosecution's case."

215

The foregoing evidence was clearly sufficient to make out a prima facie case of involuntary manslaughter as charged in the information.

The defendant asserted in his defense that he was unconscious as the result of an epileptic seizure at the time of the accident and that he had no recollection of anything that occurred from a time before he approached the traffic light at the Submarine Base until about a half hour later when he found himself walking up the hill with his father to police headquarters at Fort Christian. It was testified on behalf of the defendant that early in the morning about a year before the accident he suffered a seizure which rendered him unconscious for a half hour during which his muscles were rigid and his eyes were staring. That afternoon he consulted Dr. Nikolai Kilk who was uncertain as to the cause of the seizure. The defendant did not drive an automobile for eight months thereafter. About two months after the accident, he was found unconscious in bed, frothing at the mouth, kicking his legs, after which he became rigid. Dr. Kilk admitted the defendant to the hospital for observation and examination and arranged for a consultation with Dr. Edwin A. Weinstein, a neurologist and phychiatrist.

Dr. Weinstein testified that he first saw the defendant shortly after the accident and then again after the second attack. He sent the defendant to a physician in Puerto Rico to have an electro-encephalogram taken. The test suggested an epileptic disorder. The Puerto Rican physician reported the defendant's condition as possible grand mal epilepsy. Dr. Weinstein testified that there are three common types of epilepsy, namely, grand mal, petit mal and psychomotor, describing these seizures as follows: A grand mal seizure usually lasts about a half hour, during which the subject is unconscious, generally suffering twitching of the mouth, biting the tongue, clenching of the

jaw and rigidity of the muscles. It is followed by a period of confusion. Dr. Weinstein did not in detail describe a petit mal seizure but stated it was very brief and another witness referred to it as a "junior grand mal seizure". A phychomotor seizure lasts from a few seconds to a minute during which the subject is not unconscious but does not have full consciousness or has a very fragmentary and obscure recollection, and does certain automatic acts, mainly ritualistic automatic movements, such as fumbling around with his clothes or going over and opening and closing a drawer, but does not do acts which require thinking out beforehand or purposive acts which have a high degree of selective technical skill. In contrast with grand mal seizures, psychomotor seizures are not generally followed by confusion, recovery being quite rapid. In response to a hypothetical question, Dr. Weinstein testified that if a motorist suddenly changed his manner of driving as did the defendant before the accident, it might possibly be due to a psychomotor seizure.[1]

The defendant urges that the evidence offered on his behalf, which we have recounted, established the fact that he was suffering a psychomotor seizure at the time of the accident which rendered him unconscious and therefore not responsible for his acts. He further urges that it was error for the trial judge to reject this evidence since it was uncontradicted and was supported by the admitted fact that no skid marks were found on the highway or sidewalk at the scene of the accident. From this he would have it inferred that he was not applying the brakes at the time of the accident because of the alleged epileptic seizure.

[1]The doctor said:
"From the story as I have gotten it I don't think he had a grand mal seizure because no one observed a twitching of his mouth also, and stiffness of his muscles and clinching of his jaw. So he doesn't seem to have had that kind of seizure, that's momentarily. He might have had a psychomotive seizure." [tr. p. 190]

217

The trial judge, however, took the view that the actions of the defendant, as shown by the Government, were inconsistent with the defense that he was suffering from such a seizure at the time of the accident and he made a definite finding that the defendant did not have a seizure of any kind. To quote the trial judge's oral finding:

". . . I don't believe that the defendant had an epileptic seizure of any kind. I think that what actually happened was, the way I view the evidence, when he speeded up he went over that hill so fast that the car probably got beyond his control. The steering apparatus might have been loose or something. It zigzagged and hit the curb. That's why he didn't apply any brakes. And when the car was out of control and he saw the predicament that he was in, I think the man became frightened and left the scene of the accident, and that wasn't an aimless walk or trot. He went in the direction toward his home."

Our review of the evidence satisfies us that this was a possible finding on the evidence taken as a whole.

██ ██ The defendant, however, urges that the finding against him was arrived at by applying an erroneous legal test in evaluating the evidence. His contention is that the trial judge imposed upon him the burden of proving that he was unconscious from an epileptic seizure at the time of the accident and found against him because he had failed to meet that burden of proof. In the course of the trial judge's findings, which were orally stated at the conclusion of the trial, he said that the question was whether or not the prosecution had proven every element of its complaint beyond a reasonable doubt. This was a correct statement of the law.[2] And as we have seen, the trial judge answered this in the affirmative. "Then," continued the trial judge, "the question is whether or not the evidence as adduced by the defense convinces the Court as a factual situation that he had an epileptic seizure of some kind on the night in question." This was an erroneous

[2]Government of the Virgin Islands v. Torres, 1958, 3 V.I. 333, 336; 161 F. Supp. 699, 700.

statement of the law for the defendant did not have the burden of convincing the court he had an epileptic seizure. On the contrary, his burden was merely to go forward with the evidence to the extent necessary to raise a doubt, which upon consideration of the entire evidence was a reasonable one, as to the defendant's consciousness and freedom from an epileptic seizure at the time of the accident.

This question was ably discussed by the Supreme Court of California in People v. Hardy, 1948, 33 Cal. 2d 52, 64-65, 198 P.2d 865, 872. In that case the court said:

"The mere fact that there is a presumption which tends to support the prosecution's case does not change the amount or quantum of proof which the defendant must produce. People v. Agnew, 16 Cal. 2d 655, 107 P.2d 601. The prosecution is required to prove the offense beyond a reasonable doubt and, in so doing, may rely on any applicable presumptions. The defendant, on the other hand, is not required to prove his innocence by a preponderance of the evidence, but only to produce sufficient evidence to raise a reasonable doubt in the minds of the jury. The rule is the same whether the people rely on testimonial evidence or on presumptions, except where the presumption is conclusive. One of the factors in raising a disputable presumption, such as the one involved here, is that the matter relates to defendant personally and lies peculiarly within his knowledge, and hence for reasons of convenience and necessity he should have the burden of producing evidence thereon. This burden, however, involves merely the duty of going forward with the evidence and of raising a reasonable doubt, and not the duty to overcome the presumption by a preponderance of the evidence. See People v. Agnew, 16 Cal. 2d 655, 663-666, 107 P.2d 601. In People v. Nihell, 144 Cal. 200, 77 Pac. 916, where defendant claimed he was unconscious by reason of epilepsy, it was held that the burden was on him to establish the peculiar mental condition upon which he relied, and the court stated 144 Cal. at page 202, 77 Pac. at page 917: 'Men are presumed to be conscious when they act as if they were conscious, and if they would have the jury know that things are not what they seem, they must impart that knowledge by affirmative proof.' This is merely another way of saying that defendant has the duty

of going forward with the evidence, and it is entirely consistent with the rule that defendant has only the burden of producing evidence which would raise a reasonable doubt in the minds of the jury."

See also Davis v. United States, 1895, 160 U.S. 469, 484-488, 16 S. Ct. 353, 40 L. Ed. 499.

■ The evidence produced by the defendant in this case certainly was sufficient to raise a doubt as to the defendant's consciousness and freedom from an epileptic seizure at the time of the accident. Whether that doubt, in the light of the Government's evidence, was a reasonable one was for the trier of the facts, in this case the trial judge, to determine. We are unable to say with assurance, however, that the trial judge made this necessary determination in this case. For his statement at the close of the trial was: "I must say that I am not convinced that he had an epileptic seizure or that he was unconscious at the time that this accident happened." As we have seen, the defendant was not required to *convince* the trial judge of this fact but merely to raise a doubt in his mind which was a reasonable one on all the evidence. It might be urged that the language used by the trial judge immediately following the statement just quoted shows that the evidence had not raised such a doubt in his mind as to the consciousness and state of health of the defendant. We do not think that we should speculate upon the subject, however, in a criminal case which involves the liberty of an accused.

■ We have carefully reviewed the record. The trial which lasted several days was very ably and fairly conducted. Nonetheless, since we have no means of knowing whether the trial judge applied to his own findings in this case the erroneous rule as to the defendant's burden of proof which he stated, we think that the judgment must be reversed and that a new trial must be granted.[3]

[3]See United States v. Palermo, 3 Cir. 1958, 259 F.2d 872, 882.

220

■ In view of the fact that this case will go back to the district court for a new trial two other matters require discussion. The defendant in argument before the district court and to this court suggested that his evidence of an epileptic seizure as the cause of the accident entitles him to an acquittal under the rule that proof that mental illness was the cause of a criminal act entitles the accused to an acquittal. This rule is in force in the Territory of the Virgin Islands which has abandoned the so-called M'Naghten Rule by statute.[4] But that rule is not applicable here. For there was no evidence that the defendant's alleged epileptic seizure was an evidence or result of mental illness.[5] The defendant's claim was merely that he was unconscious at the time of the accident as a result of the alleged seizure and, therefore, did not have the necessary mens rea.

■ The final point for discussion is the possibility of criminal responsibility on the part of the defendant even though he should be found to have been unconscious from an epileptic seizure at the time of the accident. The basis of the charge of involuntary manslaughter against the defendant is that he operated his motor vehicle in "a grossly negligent manner". It has been held that the operator of an automobile who is suddenly stricken by an illness which he had no reason to anticipate but which renders it impossible for him to control the car is not chargeable with negligence.[6] On the other hand it has also been held that an operator of a motor vehicle, uncon-

[4] 14 V.I.C. § 14(4).

[5] For discussion of the distinction between epilepsy and insanity see Oborn v. State, 1910, 143 Wis. 249, 276, 126 N.W. 737, 748; People v. Freeman, 1943, 61 Cal. App. 2d 110, 115, 142 P.2d 435, 438; 1 Wharton's Criminal Law and Procedure, Anderson, 1957, p. 90. See also Smith, Medico-Legal Facets of Epilepsy, 1952-1953, 31 Texas L. Rev. 765; note, Mitchell, Legal Problems of Epilepsy, 1956, 29 Temple L.Q. 364; Glueck, Mental Disorder and the Criminal Law, 1925, pp. 338-342; Guttmacher and Weihofen, Psychiatry and the Law, 1952, pp. 160-164; Weihofen, Mental Disorder as a Criminal Defense, 1954, pp. 35-37.

[6] 1 Blashfield, Cyclopedia of Automobile Law and Practice, § 656. See People v. Freeman, 1943, 61 Cal. App. 2d 110, 142 P.2d 435.

scious from illness at the time of the accident, may nonetheless be found guilty of criminal negligence in having undertaken to drive the vehicle if he knew at the time that he might black out or lose consciousness while doing so.[7] Under the Virgin Islands Code homicide is excusable, inter alia, "when committed by accident and misfortune, or in doing any lawful act by lawful means, with usual and ordinary caution, and without any unlawful intent."[8] Whether the conduct of an accused constitutes the negligence necessary to convict a motorist of involuntary manslaughter or whether it is excusable is to be determined by the trier of the facts under all the circumstances of the particular case.[9] It was pointed out by the Supreme Court of California in People v. Freeman, 1943, 61 Cal. App. 2d 110, 116, 142 P.2d 435, 438, a prosecution for homicide by automobile involving the defense of unconsciousness caused by epilepsy, that:

". . . It was not whether he knew of facts which would lead 'a reasonable man to realize' that such a drive would create 'an unreasonable risk of bodily harm to others' but rather the question for the jury's determination was (1) whether appellant failed to do something which a reasonably prudent man would under the circumstances have done, or (2) whether he omitted to do something which a reasonable man guided by those considerations which ordinarily regulate the conduct of human affairs would do, or (3) whether he exhibited the want of such care as a person of ordinary prudence would exercise under the same circumstances."

It can thus be seen that the defendant is wrong in his contention that the mere fact of unconsciousness from an epileptic seizure entitled him, without more, to an acquittal. It is only fair to point out in this connection,

[7]Tift v. State, 1916, 17 Ga. App. 663, 88 S.E. 41; Holmes v. McNeil, 1947, 356 Mo. 846, 204 S.W.2d 303; State v. Gooze, 1951, 14 N.J. Super. 277, 81 A.2d 811; Smith v. Commonwealth 1954, Ky., 268 S.W.2d 937; Smith v. Commonwealth, 1955, Ky., 282 S.W.2d 840; People v. Eckert, 1956, 2 N.Y.2d 126, 138 N.E.2d 794. See annotations 28 A.L.R.2d 12; 63 A.L.R.2d 983.
[8]14 V.I.C. § 916(1).
[9]See 61 C.J.S. Motor Vehicles § 659(b).

however, that the inference could be drawn from the evidence that the defendant did not know at the time of the accident that he suffered from epilepsy. It also appears from the evidence that an epileptic may lawfully operate a motor vehicle in the Virgin Islands.[10] We mention these matters merely because it will be incumbent upon the fact finder to consider, in the light of the proper legal standards, the evidence which is offered at the retrial of this case.

The judgment of the district court will be reversed and the cause will be remanded for a new trial.

---

[10]A former Commissioner of Health of the Virgin Islands, called as a witness for the Government, stated that epileptics receiving some form of treatment may have approved driver's licenses in that community.