THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
SETH GRANT, Defendant-Appellant.

Fourth District    No. 13275

Opinion filed March 3, 1977.

GREEN, J., dissenting.

Richard J. Wilson and Barbara A. Chasnoff, both of State Appellate Defender's Office, of Springfield, for appellant.

Roger W. Thompson, State's Attorney, of Lincoln (John W. Foltz, Assistant State's Attorney, of counsel), for the People.

Mr. JUSTICE REARDON delivered the opinion of the court:

The defendant, Seth Grant, was sentenced to 3 to 9 years in the penitentiary after a Logan County jury found him guilty of aggravated battery and obstructing a police officer in violation of sections 12—4(b)(6) and 31—1 of the Criminal Code of 1961 (Ill. Rev. Stat. 1973, ch. 38, pars. 12—4(b)(6), 31—1). The court entered judgment on both verdicts, but only sentenced the defendant for the offense of aggravated battery.

On December 13, 1974, the defendant was a patron at a tavern known as the "Watering Place" in the City of Lincoln where he consumed four drinks consisting of whisky and cola during a 2½-hour period. The defendant then witnessed an altercation between another patron and the tavern owner. The Lincoln police were called to the scene and they forcibly escorted the other patron outside where he continued to resist arrest. A hostile crowd of approximately 40 persons accompanied the police and patron as they exited from the tavern and approached the

officers' automobile. The crowd was cheering for the patron. Suddenly, the defendant burst through the crowd, and, using a parking meter for leverage, he leaped into the air, striking Officer Raymond Vonderahe twice in the face.

Thereafter, Officer Michael Yarcho placed the defendant under arrest and forcibly led him to the officers' automobile. Yarcho testified that the defendant was very upset and that great force was required to place the defendant in the automobile. Another officer, David Morrow, testified that the defendant was excited, agitated and upset. Morrow also stated that the defendant had not been involved in the altercation prior to his attack on Vonderahe.

The defendant was transported to the Logan County jail and placed in a cell. Approximately one hour after being arrested, one of the jailers discovered the defendant lying on his cot gasping for breath. Defendant's eyes were fixed and his back formed a rigid reversed arch, typical symptoms of a grand mal convulsive seizure. The defendant was immediately transported to a Lincoln hospital by the Lincoln fire department, and then to a Springfield hospital where the defendant remained until December 23, 1974.

The record on appeal reflects that the defendant has a complicated legal and medical history. The defendant suffers from an illness known as psychomotor epilepsy. This history includes a number of violent attacks on other persons which have varied in severity. In some, physical assistance from others was required to subdue the defendant. One, a knife assault in a hospital, was of such violence that a police officer seeking to restrain the defendant was forced to use a weapon. The affray ended only when the defendant was shot in the pelvis and kidney. His past history is replete with emotional outbursts and he has been convicted on separate occasions of involuntary manslaughter and aggravated assault.

On appeal, the defendant alleges: (1) that his sanity was not proved beyond a reasonable doubt; (2) that the court erred in giving the usual insanity instruction when his defense was that he suffered an epileptic seizure at the time the offenses were allegedly committed; (3) that his two convictions are for multiple offenses committed during a single course of conduct; and (4) that the sentence imposed by the court is excessive.

■■ There was no insanity defense at early common law, although courts often entered judgments of guilt with a recommendation that the King pardon a defendant who committed an offense in self-defense or while of unsound mind. (2 F. Pollock & F. Maitland, The History of English Law 479-80 (2d ed. 1898).) Today in Illinois, all men are presumed sane, yet when the evidence raises a reasonable doubt as to a defendant's sanity at the time an offense is committed, then the affirmative defense of insanity is placed in issue for resolution by the fact

finder. (*People v. Redmond* (1974), 59 Ill. 2d 328, 320 N.E.2d 321.) Once the defense is raised, the presumption of sanity ceases and the State must establish the defendant's sanity beyond a reasonable doubt. (*People v. Ellis* (1976), 39 Ill. App. 3d 373, 350 N.E.2d 326.) A reviewing court cannot disturb a jury's finding of sanity unless it is so manifestly against the weight of the evidence as to indicate that the verdict was based on passion or prejudice. *People v. Ford* (1968), 39 Ill. 2d 318, 235 N.E.2d 576.

The defendant in the instant case argues that his sanity has not been proved beyond a reasonable doubt. Defendant relies on his testimony that his mind went blank at the "Watering Place" and that he remembered nothing until he awoke three days later. He stated that he has had previous blackouts and that he takes medicine for epilepsy. Defendant also relies on Dr. Albert Ludin's testimony that defendant has temporal lobe epilepsy with symptoms described as psychomotor and grand mal seizures. Dr. Ludin expressed his opinion that, at the time the offenses were committed, defendant was suffering from a psychomotor seizure which prevented his conscious mind from controlling his actions.

■■ The jury is not required to accept the conclusions of a psychiatrist (*People v. Greenfield* (1975), 30 Ill. App. 3d 1044, 333 N.E.2d 36), and the weight of the psychiatrist's opinion is to be measured by the reasons given for the conclusion and the factual details supporting it. (*People v. Burress* (1971), 1 Ill. App. 3d 17, 272 N.E.2d 390.) Here, Dr. Ludin stated that his opinion would be different if the defendant was not telling the truth. Analysis of the record on appeal discloses facts on which the jury could base their opinion that the defendant was being untruthful.

First, defendant alleges that he cannot remember anything that occurred during the three-day period following his arrest. The doctor, however, testified that on December 14, 1974, defendant was alert, awake and in contact with reality. Officer Yarcho also stated that the defendant was alert and not confused when he was arrested. The defendant also responded in an appropriate manner when questioned about his personal history. Next, is Officer Yarcho's troubling testimony that defendant's arrest required a great deal of force. Such testimony coincides with Dr. Ludin's statement that a person having a psychomotor seizure exhibits a great deal of strength. This testimony, however, as the State points out, must be contrasted with Officer Yarcho's later testimony that it took four men to place the defendant in an ambulance at the jail, while he initially took the defendant into custody by himself. Furthermore, Officer Yarcho testified that defendant was much stronger during the jail incident than he was during the arrest. Finally, Officer Yarcho stated that in his opinion the defendant was in possession of his "complete faculties" and "normal" at the time of his arrest. The evidence showing that the defendant had a grand mal seizure at the jail does not necessarily reflect that the defendant

also had a psychomotor seizure a short time before. While Dr. Ludin did say that sometimes a grand mal seizure is preceded by a psychomotor seizure, he did not say that this always occurs.

■■ We accordingly hold that the jury's finding of sanity was not against the manifest weight of the evidence.

The trial court instructed the jury on the question of the defendant's sanity by giving the following instruction which is taken from the Illinois Pattern Jury Instructions, Criminal, No. 24.01 (1968):

> "A person is insane and not criminally responsible for his conduct if at the time of the conduct, as a result of mental disease or mental defect, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.
>
> Abnormality manifested only by repeated criminal or otherwise anti-social conduct, is not mental disease or mental defect."

(People's Instruction No. 9.)

This instruction employs language similar to the language contained in section 6—2 of the Criminal Code of 1961 (Ill. Rev. Stat. 1973, ch. 38, par. 6—2). This instruction, however, fails to distinguish behavior by a person lacking "* * * substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law * * *" (Ill. Rev. Stat. 1973, ch. 38, par. 6—2), from automatic behavior by an individual who possesses the requisite capacity.

We note that this is a case of first impression in Illinois since no Illinois court has determined that a person's actions during a psychomotor epileptic seizure are the actions of an insane person or merely the involuntary or automatic actions of a sane person. (See *People v. Witherspoon* (1973), 55 Ill. 2d 18, 302 N.E.2d 3; *People v. Chmilenko* (1973), 14 Ill. App. 3d 270, 302 N.E.2d 455; *People v. Martin* (1966), 69 Ill. App. 2d 12, 216 N.E.2d 170; *Martin v. Fraternal Reserve Life Association* (1916), 200 Ill. App. 359; *Lauth v. Harrison-Switzer Milling Co.* (1908), 140 Ill. App. 199.) A number of cases from other jurisdictions have addressed the relationship between epilepsy and insanity without clearly distinguishing psychomotor epilepsy manifested by involuntary or automatic behavior from the forms of epilepsy manifested by petit or grand mal convulsive seizures. (*Stevens v. State* (1951), 94 Okla. Crim. 216, 232 P.2d 949; *Oborn v. State* (1910), 143 Wis. 249, 126 N.W. 737; *People v. Syjut* (1945), 310 Mich. 409, 17 N.W.2d 232; *Tibbs v. Commonwealth* (1910), 138 Ky. 558, 128 S.W. 871; *Armstead v. State* (1961), 227 Md. 73, 175 A.2d 24; *Allen v. State* (1963), 230 Md. 533, 188 A.2d 159.) Indeed, our research has disclosed only a handful of American cases that are clearly similar to the instant case. *Carter v. State* (Okla. Crim. App. 1962), 376 P.2d 351; *Government of the Virgin Islands v.*

*Smith* (3d Cir. 1960), 278 F.2d 169; *People v. Baker* (1954), 42 Cal.2d 550, 268 P.2d 705; *People v. Freeman* (1943), 61 Cal. App. 2d 110, 142 P.2d 435; *Lewis v. State* (1943), 196 Ga. 755, 27 S.E.2d 659.

■■ The term automatism is defined as the state of a person who, though capable of action, is not conscious of what he is doing. Automatism is not insanity. (LaFave & Scott, Criminal Law § 44, at 337 (1972).) In the language of section 4—1 of our Criminal Code, it is manifested by the performance of involuntary acts that can be of a simple or complex nature. Clinically, automatism has been identified in a wide variety of physical conditions including: epilepsy, organic brain disease, concussional states following head injuries, drug abuse, hypoglycemia and, less commonly, in some types of schizophrenia and acute emotional disturbance. (LaFave & Scott 337.) Psychomotor epileptics not only engage in automatic or fugue-like activity, but they may also suffer convulsive seizures. 2 Cecil-Loeb, Textbook of Medicine 1512-1513 (12th ed. Beeson & McDermott 1967).

Section 4—1 of our Criminal Code provides:

"A material element of every offense is a voluntary act, which includes an omission to perform a duty which the law imposes on the offender and which he is physically capable of performing." (Ill. Rev. Stat. 1973, ch. 38, par. 4—1.)

While the Illinois Pattern Jury Instructions contain an instruction relating to this statute (IPI Criminal No. 4.14), that instruction was neither requested by the defendant nor read to the jury in this case. Defense counsel, however, objected to the instructions and verdict forms relating to the insanity defense at the instruction conference and in his post-trial motion.

Section 4—3(a) of our Criminal Code of 1961 provides:

"A person is not guilty of an offense, other than an offense which involves absolute liability, unless, with respect to each element described by the statute defining the offense, he acts while having one of the mental states described in Sections 4—4 through 4—7." (Ill. Rev. Stat. 1973, ch. 38, par. 4—3(a).)

Thus, the requisite mental state may include, but is not limited to, the following:

"A person is reckless or acts recklessly, when he consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, described by the statute defining the offense; and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation. An act performed recklessly is performed wantonly, within the meaning of a statute using the latter term, unless the

statute clearly requires another meaning." (Section 4—6 of the Code (Ill. Rev. Stat. 1973, ch. 38, par. 4—6).)

These statutes relate to the requisite mental state that the defendant may have had at the time he attacked Officer Vonderahe, a question on which the jury was not instructed.

Ordinarily, a defendant cannot complain on appeal that an instruction was not given if he failed to tender that instruction at trial (*People v. Tannahill* (1976), 38 Ill. App. 3d 767, 348 N.E.2d 847); however, Supreme Court Rule 451(c) states that "* * * substantial defects [in jury instructions] are not waived by failure to make timely objections thereto if the interests of justice require." (58 Ill. 2d R. 451(c).) See *People v. Price* (1968), 96 Ill. App. 2d 86, 238 N.E.2d 881; *People v. Lewis* (1976), 37 Ill. App. 3d 870, 346 N.E.2d 377.

■■ One of defense counsel's allegations on appeal is that all of the instructions, considered together, confused the jury on the insanity issue. As noted earlier, this is a case of first impression in this State and we cannot say that the defendant's failure to tender alternative instructions waived the error here. Accordingly, we hold that the interests of justice require reversal of the defendant's convictions because the jury instructions are substantially defective in that they do not contain an instruction on the defense of involuntary conduct. We note that courts in other jurisdictions have held that the defendant who introduces evidence of abnormal mental condition, bearing upon the state of mind required for the crime with which he is charged, is entitled to an instruction drawing the jury's attention to that evidence. *People v. Henderson* (1963), 60 Cal. 2d 482, 386 P.2d 677, 35 Cal. Rptr. 77; *People v. Conley* (1966), 64 Cal. 2d 310, 411 P.2d 911, 49 Cal. Rptr. 815; *State v. Vigliano* (1964), 43 N.J. 44, 202 A.2d 657; Annot., 22 A.L.R. 3d 1228, 1257-60 (1968).

· We distinguish *People v. Espenscheid* (1969), 109 Ill. App. 2d 107, 249 N.E.2d 866, which held that the trial court properly refused to give IPI Criminal No. 4.14 because there was no evidence tending to prove that the defendant performed an involuntary act. The entire record on appeal here, especially the testimony of Dr. Ludin, reflects that the defendant suffers from psychomotor epilepsy which is not insanity. The record reflects that the defendant may have been acting in a state of automatism when he attacked Officer Vonderahe on December 13, 1974. We therefore leave the factual resolution of this question to a jury that is properly instructed as to section 4—1 and 4—3 through 4—7 of the Code.

■■ Although a voluntary act is an absolute requirement for criminal liability under section 4—1 of our Code (Ill. Rev. Stat. 1973, ch. 38, par. 4—1), there is no requirement that every act preceding the actual commission of the offense be voluntary. Thus, the jury may, on remand,

determine that the defendant attacked Officer Vonderahe while in a state of automatism, but that he nevertheless committed an offense for which he is criminally responsible if he had prior notice of his susceptibility to engage in violent involuntary conduct brought on by drinking alcoholic beverages or by some other conscious causal behavior. LaFave & Scott 181, 337-38.

We are not troubled by the decision of the British House of Lords affirming a murder conviction in which the trial judge refused to instruct on the defense of automatism despite the presence of evidence tending to establish that the defendant was suffering a psychomotor epileptic seizure at the time the offense was committed. (*Bratty v. Attorney-General for Northern Ireland* (1961), 3 AllE. R. 523, 535.) Lord Denning's opinion in *Bratty* states that implementation of the automatism defense, apart from the defense of insanity, is a policy matter that should be reserved for courts and not medical experts. Lord Denning himself felt that any mental disorder manifesting itself in a form of violence that is prone to recur is a disease of the mind. He stated that it is the sort of disease requiring detention rather than an unqualified acquittal.

As noted by LaFave & Scott in their treatise on criminal law:

> "If, as just noted, the insanity defense has been utilized as if it 'superceded' a no-mental-state defense for those who might pose a continuing danger because of their mental illness, it might logically be asked whether there has developed a comparable relationship between the insanity defense and the no-voluntary-act automatism defense. That is, is there here as well pressure to 'make the insanity defense the exclusive avenue for bringing subjective evidence into the trial,' to the end that those who did not act voluntarily might be committed if there is some chance that they are still dangerous?
>
> The few American cases in this area are not particularly helpful in this regard, although they do reflect that what has been described herein as automatism has sometimes been instead labelled insanity, perhaps for the reason suggested above." LaFave & Scott 338-39.

In Illinois, we have a generally well-reasoned and modern Criminal Code. (Ill. Rev. Stat. 1973, ch. 38, par. 1—1 *et seq.*) This Code provides for the affirmative defense of insanity and requires that every offense be the result of a voluntary act. Our legislature has provided that a person found not guilty of an offense by reason of insanity can be committed to a mental health facility for treatment, although no such provision applies to an alleged offender who commits an involuntary act. (Section 5—2—4 of the Unified Code of Corrections (Ill. Rev. Stat. 1973, ch. 38, par. 1005—2—4).) These provisions are rational and constitute policy responses to a compelling need by a legislature empowered to act.

■■ On remand, the defendant will again run the risk of being convicted for the offenses of aggravated battery or obstructing a police officer if the jury finds that he was not insane when he attacked Officer Vonderahe and that he either consciously committed the offense or recklessly brought about his alleged psychomotor epileptic seizure and its accompanying state of automatism. As some commentators have suggested, the jury plays an important role when the defense is raised:

> "* * * automatism as a result of psychomotor seizures should be [a] valid criminal defense. The dearth of cases employing this defense suggests that the problem is one of proof. If one is sane immediately prior to and after the unlawful act is committed it is difficult to establish that a particular violent act occurred as a result of a psychomotor seizure." (Barrow & Fabing, Epilepsy and the Law 92-93 (1956).)

If the jury finds that the defendant was sane but not responsible for the attack on Officer Vonderahe, then he cannot be committed for the offenses. We find this course to be mandated by our legislature which only provided for the commitment of persons who are criminally insane. Ill. Rev. Stat. 1973, ch. 38, par. 1005—2—4.

■■ This court has recently held that a defendant can be neither convicted nor sentenced for separate offenses arising from the same course of conduct. (*People v. Grady* (1976), 43 Ill. App. 3d 473, 357 N.E.2d 230.) In the instant case, the defendant was convicted of both aggravated battery and obstructing a police officer, offenses arising from his single attack on Officer Vonderahe. We therefore hold that the conviction for the lesser offense of obstructing a police officer must be reversed.

In view of the fact that we are remanding this case for a new trial, we do not address the question of whether the 3- to 9-year sentence of imprisonment imposed by the trial court is excessive.

For the reasons stated herein, we reverse the defendant's convictions for aggravated battery and obstructing a police officer, and we remand the case to the Circuit Court of Logan County for a new trial.

We must, in the interests of clarity, anticipatorily respond to the views expressed by our dissenting Brother. The insanity defense consists of three elements: (1) presence of a mental disease or defect, (2) lack of cognition, and (3) lack of volition. In contrast, the involuntary action/automatism defense consists of a single element: lack of volition. The jury, in rejecting the instant defendant's insanity defense, may have rejected all three elements, any two, or indeed, only one of the elements. The record, however, does not disclose which elements were rejected by the jury and we cannot presume, as does our Brother, that the jury rejected all three elements of the insanity defense. We therefore cannot

say that the jury impliedly rejected the involuntary action defense of which they were totally unaware.

Reversed and remanded with directions.

CRAVEN, P. J., concurs.

Mr. JUSTICE GREEN, dissenting:

I agree with the majority that a person while in a state of automatism brought on by a psychomotor epileptic seizure cannot perform a voluntary act and, therefore, cannot be guilty of an offense of which that voluntary act is a necessary element. I do not agree that under the circumstances of this case, justice requires that a new trial be given defendant for the failure by the court to instruct the jury as to the requirement for a voluntary act. Neither do I agree that the instructions given were misleading.

Most of my disagreement with the majority stems from my belief that an epileptic striking another person while in a state of automatism not only lacks the volition to perform a voluntary act but is also insane within the meaning of section 6—2 of the Criminal Code because that epileptic is *at that time* suffering from a mental disease or defect that results in the epileptic's lack of substantial capacity to conform his conduct to the requirements of law *at that time*. It seems to me to be axiomatic that if defendant struck the police officer at a time when his body was not responding to his conscious mind because of a particular type of epileptic seizure, then at that time defendant lacked substantial capacity to conform his conduct to the requirements of law. The lack of capacity for volition negates both the ability to voluntarily act and the ability to prevent an involuntary act. This reasoning is substantiated by the comments of the drafting committee for the Criminal Code. The comments with reference to section 6—2 discuss the history of Illinois case law leading to the two part test of the section and then state, "The section accepts the position, as did the prior Illinois law, that impairment of *volitional capacity* no less than impairment of cognition must be included in the formulation." (Ill. Ann. Stat., ch. 38, par. 6—2, Committee Comments, at 329 (Smith-Hurd 1972).) The impairment of volitional capacity is the essence of automatism.

Defense counsel at trial chose to try the case upon the theory that the defendant was insane. The evidence of insanity was based upon the opinion of Dr. Ludin that, at the time of the occurrence, defendant was suffering a psychomotor seizure producing a state of automatism and that this was a mental defect which would have deprived defendant of the substantial capacity to appreciate right from wrong and to "conform his

conduct to the requirements of law." No case has been called to my attention that would have prevented defendant from trying the case on this theory or that would have permitted the court to strike Dr. Ludin's testimony on the theory that automatism is, as a matter of law, not insanity.

The theory that the jury should have been instructed upon the requirements for a voluntary act has arisen for the first time on appeal. The very evidence relied upon on appeal to show that defendant was in a state of automatism and therefore incapable of performing a voluntary act is the same evidence relied upon at trial to show that defendant was in a state of automatism and therefore insane. Under the clear terms of section 6—2 and under the instructions on insanity given by the trial court, the jury was required to return one of the verdicts of not guilty unless the jury determined beyond a reasonable doubt that defendant possessed *both* volition and cognition at the time he committed the acts in question unless the jury also determined that any lack of volition or cognition did not result from a mental disease or mental defect. The only testimony describing the nature of defendant's claimed condition of automatism defined his condition as a mental disease or mental defect. I thus conclude that the jury must have determined beyond a reasonable doubt that defendant was not in a state of automatism which destroyed his volition at the time of the occurrence. For this reason, I further conclude that the jury rejected the evidence which would have supported the need for the instruction on the requirement for a voluntary act. Were such an instruction tendered, it should have been given. Since it was not tendered, I do not think that justice requires the extraordinary step of granting a new trial so that another jury can make a new determination upon the proof rejected by the first jury.

The complaint at trial about the instruction on insanity concerned the contention that error occurred in submitting to the jury the possibility of finding defendant not guilty by reason of insanity and not recovered. The defense contended that since defendant had recovered from his seizure, he was no longer insane. Since the jury found defendant guilty, that question is no longer an issue. The determination of the majority, however, is that the instruction on insanity, not objected to by defendant at trial, misled the jury because it failed to distinguish the behavior of a person lacking the substantial capacities described in the two part test of section 6—2 from automatic behavior by an individual who possesses the requisite capacity. In this case, the evidence of defendant's insanity and the evidence that defendant lacked the ability to perform a voluntary act was the same—evidence that he was in a state of automatism at the time of the act. As I have indicated, I believe that a person lacking the capacity to perform a voluntary act who nevertheless commits a wrongful

involuntary act, lacks the capacity to prevent the doing of that involuntary wrongful act.

I share with Lord Denning and the majority of commentators on the subject (LaFave and Scott 341) a belief in the need for protective custody for persons who repeatedly attack others while in a state of automatism. The situation merits an attempt by the legislature to devise a procedure balancing the rights of the public to be protected against the rights of the person subject to automatism to be at liberty and basing any deprivation of that liberty upon the degree of danger presented by that individual. (*O'Connor v. Donaldson* (1975), 422 U.S. 563, 45 L. Ed. 2d 396, 95 S. Ct. 2486.) I do not agree that the Criminal Code is sufficient. Most of the authority cited by the majority discussing automatism is of comparatively recent origin, and the comments of the drafting committee give no indication of any consideration of the problem by that committee.

The instant case must be decided upon the basis of existing law, however. As I have indicated, since the jury rejected the underlying assumption upon which is based the need for an instruction setting forth the requirement for a voluntary act as an element of the offense, I would not grant a new trial. I do not deem the sentence to be excessive. Accordingly, I would affirm the conviction for aggravated battery and the sentence imposed thereon. I agree that the conviction for obstructing a police officer could not stand if the aggravated battery conviction was upheld.