(No. 42594.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee,
v. WILLIAM EARL BASSETT *et al.,* Appellants.

*Opinion filed January 31, 1974.*

UNDERWOOD, C.J., and WARD, J., dissenting.

Alan P. Olschwang, of Leibman, Williams, Bennett, Baird and Minow, of Chicago, for appellants William Earl Bassett and Alonzo Howard Jones.

Stuart R. Lefstein, of Katz, McAndrews, Durkee & Telleen, of Rock Island, for appellant John William Stamps.

Michael D. Gitlitz, of Skokie, and Thomas Gumbel, of East St. Louis, for appellant Robert Lee Brown.

William J. Scott, Attorney General, of Springfield (Raymond L. Terrell, Assistant Attorney General, of counsel), for the People.

MR. JUSTICE DAVIS delivered the opinion of the court:

The defendants in this case were tried and convicted

of murder, arising from a prison riot which occurred at Menard Penitentiary on November 23, 1965. The charges were filed in Randolph County, but on motion for change of venue the trial was held in the circuit court of Sangamon County. The defendants were tried for the killing of the three prison guards, although they were indicted for many other crimes which took place during the course of the riot. This case is before us pursuant to Supreme Court Rule 603 (50 Ill.2d R. 603) because of the imposition of the death penalty against defendants Bassett, Jones and Stamps. Defendant Brown, a/k/a Griffin, was sentenced to 50 to 75 years on each count.

Many errors have been alleged by the defendants, as may be expected on appeal from a multiple-murder trial that lasted for four months and produced a record of over 12,000 pages. Defendants Bassett and Jones have filed a joint brief, and their allegations of error apply to themselves and to the other defendants. Defendants Stamps and Griffin have incorporated the allegations of error asserted by Bassett and Jones, and have made further allegations specifically as to themselves.

It should be noted at the outset that this case must be remanded for the imposition of new sentences as to defendants Bassett, Jones and Stamps in accordance with *Furman v. Georgia* (1972), 408 U.S. 238, 33 L. Ed. 2d 346, 92 S. Ct. 2726; and *Moore v. Illinois* (1972), 408 U.S. 786, 33 L. Ed. 2d 706, 92 S. Ct. 2562, and our procedure for implementation of these holdings established in *People v. Speck* (1972), 52 Ill.2d 284; *People v. Newbury* (1972), 53 Ill.2d 228; and *People v. Clark* (1972), 52 Ill.2d 374.

The outbreak occurred shortly after 4:00 P.M. on November 23, 1965, during the supper feeding. The defendants entered the dining room along with the other inmates who were in the vocational school gang. When defendant Bassett arrived at the steam table at which he was to have received his food, he started a fight with another inmate and stabbed him with a hand-made knife. Defendant Jones threw a Molotov cocktail, which he had

brought with him, at the guard tower in the front of the dining room. The bottle exploded and burst into flames.

Considering all of the testimony, it appears the following happened: Lieutenant Paul went over to break up Bassett's fight, and Jones went after Paul, grabbed him from behind by the neck and stabbed him. There is some testimony that all four defendants participated in the stabbing of Lieutenant Paul. While Paul was being stabbed, or immediately thereafter, defendant Griffin went over to the burning guard tower, climbed up on a plate rack and reached in, presumably to grab the guard's rifle. Officer Wilson attempted to come to Paul's aid, but did not make it because he was stabbed by defendant Stamps.

Eventually all of the defendants made their way to the kitchen. Stamps apparently attempted to get into the kitchen first, but Officer Gross was at the door and resisted. After a struggle, Stamps pulled Gross from the doorway and stabbed him. Officer Kisro went to Gross's aid, and Stamps stabbed Kisro in the stomach. The defendants all wound up in the kitchen, having taken with them as hostages two uninjured guards and Officer Gross. Twenty-three inmates who worked in the kitchen were also there. The defendants refused to come out, or hand over their knives.

During the approximately four-hour period in which they held out in the kitchen, each defendant made inculpatory statements, and they conducted themselves in such a manner as to effectively segregate themselves as a group separate from those inmates who were supposed to be in the kitchen.

Officers Kisro and Wilson and Lieutenant Paul died as a result of their injuries. Seven or eight other guards were injured. One, the officer from the guard tower, suffered from burns, and the others from stab wounds.

It is urged that the prosecution had in its possession various statements, made by witnesses for the People, which should have been turned over to the defense in

accordance with *People v. Wolff* (1960), 19 Ill.2d 318. This question is now controlled by Supreme Court Rule 412, which was not effective at the time of this trial.

However, Rule 412, like *People v. Wolff,* was, in general, based on the rationale of *Jencks v. United States* (1957), 353 U.S. 657, 1 L. Ed. 2d 1103, 77 S. Ct. 1007, *Palermo v. United States* (1959), 360 U.S. 343, 3 L. Ed. 2d 1287, 79 S. Ct. 1217, and *People v. Moses* (1957), 11 Ill.2d 84. Section (a)(i) of Supreme Court Rule 412 provides that upon written motion of defense counsel the State shall disclose to defense counsel the following material and information within its possession and control:

> "(i) the names and last known addresses of persons whom the State intends to call as witnesses, together with their relevant written or recorded statements, memoranda containing substantially verbatim reports of their oral statements, and a list of memoranda reporting or summarizing their oral statements. Upon written motion of defense counsel memoranda reporting or summarizing oral statements shall be examined by the court *in camera* and if found to be substantially verbatim reports of oral statements shall be disclosed to defense counsel." 50 Ill.2d R. 412.

*Wolff* concerned testimony given by a People's witness who testified on cross-examination that he had made a statement to the police, but couldn't recall if it had been written down. Defense counsel then asked if the statement had ever been shown to the witness, the State objected on the ground that defense counsel was assuming the existence of the statement, and the objection was sustained. In *Wolff,* at page 327, this court stated:

> "*** where no privilege exists, and where the relevancy and competency of a statement or report has been established, the trial judge shall order the document delivered directly to the accused for his inspection and use for impeachment purposes. However, if the prosecution claims that any document ordered to be produced

contains matter which does not relate to the testimony of the witness sought to be impeached, the trial judge will inspect the document and may, at his discretion, delete unrelated matters before delivery is made to the accused."

The instant case concerns interviews by State personnel with at least 800 to 900 inmates of Menard Penitentiary. The procedure followed according to the prosecuting attorneys, was that notes would be taken on yellow paper during the interview but these would not be verbatim notes. After all the interviews were completed, these notes were transcribed onto white cards, allegedly containing a narrative of what the prosecutor expected to prove by each witness. The prosecution claims that no attempt was made to obtain the signatures of those being interviewed and no such "formal statement" was produced.

It must be conceded that the representatives of the People who conducted these interviews sought to take notes that would be of some use in the preparation and trial of the case; and that when assistant Attorney General Crain or others transcribed these original "rough notes" into "narrative" form on white cards, it was done in such a manner as to make these cards useful at trial. It would seem that these cards would be useless unless they accurately summarized the point the People wished to be proved by any given witness.

There is also testimony that these cards were used in discussing a prospective witness's testimony before trial, and that at the discussion the witness thought he was being told what he had said in his initial interview. He did not say that what was read to him from the card was word for word what he had previously stated, but that it accurately reflected the substance of what he had told the interviewer.

In this case the defense could not prove the existence of the original notes, for they had been destroyed by the prosecution. The defense was then faced with showing that

the white cards being used by Crain were verbatim or substantially verbatim copies of the witnesses' earlier remarks. Crain stated repeatedly and strenuously that no verbatim or substantially verbatim statements existed. The truth or falsity of this statement depends upon one's conception of the rationale behind the *Wolff* case and later decisions.

In *People v. Sumner* (1969), 43 Ill.2d 228, 235, we stated:

> "Curtis's statement should also have been given to the defendant. This court in *People v. Wolff,* 19 Ill.2d 318, expressly adopted the Federal rule first announced in *Jencks v. United States,* 353 U.S. 657, 1 L. Ed. 2d 1103, 77 S. Ct. 1007, and later made part of a Federal statute, (18 U.S.C. sec. 3500) that where the relevancy and competency of a statement or report has been established, and no privilege exists, the trial court, on appropriate demand, shall order the statement or report delivered directly to the accused for his inspection and possible use for impeachment purposes. (19 Ill.2d at 327; see also *People v. Cagle,* 41 Ill.2d 528, 532.) It was expressly recognized in *Wolff* that once a statement is shown to contain pertinent material, only the defense should be permitted to determine whether it may be useful for impeachment."

This decision precludes the trial court from examining the statement to determine if it is in fact impeaching.

*Sumner* outlines the proper approach to the problem, and the application of that rationale to the instant case requires that the white cards used by the People's attorneys at trial should have been made available to the defense for impeachment purposes. It must be noted that there may be some problem here in determining what is or is not the substance of the statement by the witness.

The prosecution admittedly had recorded information

on white cards of such a nature as to be useful in its examination of the witnesses. The prosecutor had not personally interviewed all of the witnesses, and he could not possibly keep over 800 interviews straight in his mind, even if he had. These cards, by their very nature, had to be a reproduction in one form or another of what the witness said when interviewed earlier. As such, that portion of the material which can fairly be said to be the witness's statement must be turned over to the defense so that they may determine its worth as impeachment material. In the event the prosecutor claims that validly protected work product is also contained in the statement, the trial judge can review the material *in camera* for the limited purpose of excising the work-product material.

The defense here has laid as good a foundation for the admission of this evidence as is possible, and should have been provided the white cards for examination, subject to the People's right to have work product deleted therefrom. The People argue that the destruction of the rough notes taken during interviews of witnesses does not warrant the striking of the witnesses' testimony, absent a showing of bad faith on the part of the State. We agree with that general proposition, but inasmuch as we have held that the white cards should have been made available to the defense, the issue of the destruction of the original rough notes loses its relevance.

However, we note that the testimony of the witnesses who had been interviewed was not required to prove the defendants guilty of murder on the accountability theory; namely, that all defendants were participants in a plan to escape from the penitentiary at the time, and were all therefore liable for the crimes committed in the furtherance of the escape plan.

Finally, the People argue that even if the defendants were entitled to see the cards, reversible error was not committed because the error could not have conceivably changed the verdict. A discussion of this point at this time

and place in the opinion would be premature, and the issue will be considered in the later discussion of all allegations of error.

Additionally, all defendants allege that their convictions must be reversed due to the People's knowing use of perjured testimony. (*Napue v. Illinois* (1959), 360 U.S. 264, 3 L. Ed. 2d 1217, 79 S. Ct. 1173; *People v. McKinney* (1964), 31 Ill.2d 246.) The issue is one of fact. The defense attorneys, during post-trial motions, contended that perjured testimony had been knowingly used by the People and submitted affidavits to support that contention. There are at least two aspects of this charge. One is that representatives of the People actually told the inmate witnesses how to testify and coached them accordingly. Another aspect is that perjury is inferred by the practice, shown by the offer of proof, that high-ranking Department of Public Safety officials purchased favorable testimony by promising probation, parole or clemency to co-operative inmates. The State filed counter-affidavits which denied the allegations of the defendants relative to the knowing use of perjured testimony.

The trial court considered post-trial affidavits, counteraffidavits and testimony given at the post-trial hearing, and determined that perjured testimony was not knowingly used by the People, and denied the defendants' motion for a new trial grounded on this basis.

We recently held in *People v. Harris* (1973), 55 Ill.2d 15, that the burden of proof of this type of allegation of error lies with the defendant. In *Harris,* the defendant could show only that the co-defendants who had testified against him at trial had testified under oath that no promise had been made to them by the People. Five days after the conclusion of the defendant's case, the People nol-prossed the murder indictments against the two co-defendant witnesses. We held there that those facts alone did not establish knowing use of perjured testimony.

The defendants here have introduced some evidence

which would tend to support their allegations. First, they ask us to infer, from the granting of early parole to several witnesses for the People, that deals were made. The only difference between this proof and that in *Harris* is one of degree. Second, they submitted, in support of their post-trial motions for new trial, depositions of inmates which contained allegations which, if believed, offered some support of their contentions. These depositions were admitted for the limited purpose of an offer of proof.

The remaining question is whether the defendants have proved their point. We do not believe that they have. We note here that the evidence was conflicting. However, even if this evidence were admitted generally, we do not find that it established the knowing use of perjured testimony; and in any event, such testimony would not require a reversal under the State's accountability theory of this case, since the alleged use of perjured testimony did not pertain thereto, but pertained only to the direct participation of each defendant in the stabbings which caused the death of the respective guards.

The defendants object to testimony of occurrences which took place while the defendants were locked in the kitchen after the guards had been killed or mortally wounded. The basis for the argument seems to be that this constitutes evidence of "other crimes," and is not relevant to the charge of murder. The theory of the prosecution is that the murders were committed pursuant to a conspiracy to escape and an attempt to escape. Such evidence is relevant to support that theory, and it is also relevant for the purpose of establishing circumstantially that defendant Griffin is guilty of murder on a theory of accountability. It is the rule in Illinois that evidence of other crimes is admissible if such evidence is relevant to an issue material to the case. *People v. Lewerenz* (1962), 24 Ill.2d 295.

Defendants Bassett and Jones also complain that incriminating statements of defendants Stamps and Griffin made during the time they were in the kitchen were

introduced. They say they were denied their right to confront and cross-examine the witnesses against them. (*Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620.) The statements in question are not within the *Bruton* rule, but rather are covered by our opinion in *People v. Rosochacki* (1969), 41 Ill.2d 483. That case distinguishes *Bruton* from those instances in which the complaining defendant himself has made similar inculpatory admissions, as had the defendants Bassett and Jones in this case. The statement made by each defendant is set forth later in the opinion. The introduction of the statements of defendants Griffin and Stamps was not error.

Various other allegations of error include those of prejudicial comment by the prosecutor, improper sequestration of the jury, improper cross-examination of a defense witness, admission of evidence of wounds suffered by other guards, evidence as to what constitutes "good time," and interference with the interviewing of witnesses. Under the circumstances of this case, these allegations do not raise issues which affect its outcome, for the reasons later set forth.

Defendant Stamps, in addition to joining in the allegations of error urged by the other defendants, urges that he must be given a new trial for failure of the court to properly instruct the jury as to the insanity defense, and provide the jury with appropriate verdict forms. We agree.

Section 115—4(j) of the Code of Criminal Procedure (Ill. Rev. Stat. 1965, ch. 38, par. 115—4(j)), in force at the time of trial, provides:

"(j) Unless the affirmative defense of insanity has been presented during the trial, the jury shall return a general verdict as to each offense charged. When the affirmative defense of insanity has been presented during the trial, the court shall provide the jury not only with general verdict forms but also with a special verdict form of not guilty by reason of insanity, as to each offense charged, and in such event the court shall separately instruct the

jury that a special verdict of not guilty by reason of insanity may be returned instead of a general verdict but such special verdict requires a finding by the jury that the defendant committed the acts charged but at the time of the commission of those acts the defendant was insane. In the event of a verdict of not guilty by reason of insanity, the jury shall state in its verdict whether or not the defendant has recovered from his former condition of insanity."

Not guilty by reason of insanity is an affirmative defense. (Ill. Rev. Stat. 1965, ch. 38, par. 6—4.) The impact of an affirmative defense is defined by statute. Section 3—2 of the Criminal Code (Ill. Rev. Stat. 1965, ch. 38, par. 3—2) provided at time of trial:

"(a) 'Affirmative defense' means that unless the State's evidence raises the issue involving the alleged defense, the defendant, to raise the issue, must present some evidence thereon.

(b) If the issue involved in an affirmative defense is raised then the State must sustain the burden of proving the defendant guilty beyond a reasonable doubt as to that issue together with all the other elements of the offense."

It cannot be argued that Stamps did not present sufficient evidence to raise the affirmative defense of insanity. Prior to trial, Stamp's counsel had indicated that he would raise the defense of insanity, he said so during his opening statement, he produced two psychiatrists and one psychologist who testified as to his sanity, and several lay persons testified as to his lack of sanity. The defense clearly was raised.

Defendant Stamps claims he was entitled to have his tendered instruction No. 25 submitted to the jury and an appropriate jury verdict form submitted also. Instruction No. 25 reads as follows:

"If you find that the State has not proven beyond all reasonable doubt that John William Stamps was legally sane at the time of the commission of the acts alleged in the Indictment, charging him with murder, you will then be required to determine whether or not he has recovered from the mental disease or mental defect from which he was suffering at that time.

> If you find that John William Stamps has not entirely and permanently recovered from any such mental disease or mental defect, you should sign the following verdict:
>
> > 'We, the jury, find the Defendant, John William Stamps, committed the acts alleged in the Indictment, charging him with murder, but at the time of the commission of said acts he was an insane person, and that he has not permanently and entirely recovered from such insanity. And we further-find from the evidence that the Defendant, John William Stamps, is now about the age of —— years.'
>
> On the other hand, if you find that John William Stamps has entirely and permanently recovered from any such mental disease or mental defect, you should sign the following verdict:
>
> > 'We, the jury, find the Defendant John William Stamps, committed the acts alleged in the Indictment, charging him with murder, but at the time of the commission of said act he was an insane person, and that since the commission of said act he has permanently and entirely recovered from such insanity.' "

This instruction was objected to on the grounds that there was no evidence in the record to establish that Stamps had recovered from an insane condition, even if the jury found that such condition had existed at the time of the killings. The People rely on *People v. Yonder* (1969), 44 Ill.2d 376, for the proposition that it is not error to fail to instruct as to a finding of recovery when no evidence of recovery has been given. The case is not analogous for there the entire trial of the case revolved around a claim of insanity, with no claim of recovery. The jury was given verdict forms for not guilty, not guilty by reason of insanity and not recovered, and guilty, as requested by the parties. This court there held that the defendant could not, on review, change his theory of the case, especially when the record would not support the new theory.

In the present case, the jury verdict forms as to insanity were refused altogether. Here also, there is at least some evidence to support a finding of recovery, both by inferences drawn from some of the defendants' expert

testimony, and by the People's witnesses. We note again that the language of section 115—4(j) of the Code of Criminal Procedure is mandatory, and we do not now hold it to be otherwise.

We do not deem it necessary to discuss the various contentions of the parties in reference to other specific instructions given. On retrial the jury will be instructed as provided in I.P.I.—Criminal.

Defendant Griffin alleges that there is not sufficient evidence to sustain his conviction because he was not proved guilty beyond a reasonable doubt. Inasmuch as the People's final contention is that any error which is not of constitutional dimensions in this case is only harmless error, and that any error found to be of constitutional dimensions is harmless error beyond a reasonable doubt because the evidence of guilt is so overwhelming, we will consider the errors alleged by all the defendants at this point.

The People proceeded on two theories at trial. One was that there was sufficient direct evidence of the participation of each defendant in the stabbings that each could be found guilty on that evidence alone. Secondly, that there was sufficient evidence to show that each of the defendants was a party to a plan to escape from the penitentiary, and that each was therefore liable for the crimes committed by the others in the furtherance of the escape plan.

We are unable to say that there is any evidence of a direct showing of guilt as to defendants Bassett or Griffin which is not subject to our discussion of *People v. Wolff.* We therefore, as far as the direct theory of the case is concerned, will not consider the errors alleged to be either harmless error, or harmless error beyond a reasonable doubt, as to these defendants.

The remaining theory of the case of the People is that of accountability. This theory can be proved by the events which occurred after the four defendants were in the kitchen.

The statutory provisions creating guilt by accountability at the time of the riot are as follows:

"5—1. A person is responsible for conduct which is an element of an offense if the conduct is either that of the person himself, or that of another and he is legally accountable for such conduct as provided in Section 5—2, or both."

"5—2. A person is legally accountable for the conduct of another when:

* * *

(c) Either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense. ***" Ill. Rev. Stat. 1965, ch. 38, par. 5—1, 5—2.

Several inculpatory statements were made by the defendants while in the kitchen. Defendant Griffin said, "I want you to understand that none of the inmates back here (inmates working in the kitchen at the time the kitchen was entered by defendants) were involved in any of this. We four who are trapped in here are the only ones who were involved in this thing." Defendant Stamps reiterated what Griffin had said. "We are the only ones that were involved in this. We four are the only ones." All the defendants were present in the kitchen area when these statements were made. When asked by a guard for his knife, defendant Jones said, "I will give you this shiv. If you get this, you will get it right between the God damned ribs just like the others got it. If you get it that is the way you will get it." When told by an inmate that he thought Bassett had broken officer Wilson's leg, Bassett replied, "Well, I ought to break the *** other leg." The admissibility of these statements has been discussed and ruled upon favorably above. The statements of Griffin and Stamps show that they considered themselves to be part of a four-man team, and the statements and acts of Bassett and Jones are fully corroborative of the fact that they were part of the four-person group. All the defendants were grouped together in the serving line immediately before

the disturbance began; all were observed with knives or "shivs" prior to and after the time they forced their way into the kitchen. After gaining entrance to the kitchen, they shook down and searched the guard hostages, they blocked the door to the bakery with bean sacks and closed all other entrances or exits thereto. They obtained cook uniforms and put them on in place of their regular prison clothing. Griffin climbed to a skylight and reported to the others there that they couldn't go out that way because there were State Police up there.

The segregation of the defendants from the inmates regularly assigned to the kitchen also supports the inference that they acted together according to some apparent agreement. We said in *People v. Richardson* (1965), 32 Ill.2d 472, 477, quoting from *People v. Clark* (1963), 30 Ill.2d 67, that, "While mere presence or negative acquiescence is not sufficient to constitute a person a principal to a crime, one may aid and abet, without actively participating in the overt act, and if the proof shows he was present at the crime without disapproving or opposing it, the trier of fact may competently consider this conduct in connection with other circumstances and thereby reach a conclusion that such person assented to the commission of the criminal act, lent his countenance and approval and was thereby aiding and abetting the crime."

There was sufficient evidence arising from the conduct of the defendants and their inculpatory statements while in the kitchen to establish that all four were acting as a group, and had been since the beginning of the disturbance. Since there was some credible evidence to establish that both defendants Jones and Stamps stabbed guards who consequently died, they are all accountable for those acts pursuant to the statutory provisions set forth above.

We therefore hold that, even when not considering all of the direct evidence as to specific stabbings for the reasons set forth above, there is overwhelming evidence to support the conviction of the defendants on a theory of

accountability. That the jury thought there was sufficient evidence to find guilt on a theory of accountability is evidenced by the fact that defendant Griffin was not the recipient of a death penalty recommendation, as were the other defendants. The direct evidence was weakest as to Griffin, and the only rational explanation for the difference in penalty recommendations is that the jury did not wish to deal so harshly with a person who they did not believe actually killed anyone himself.

Therefore, the convictions of defendants Jones, Bassett and Griffin are affirmed and the sentences of Jones and Bassett are vacated and the causes are remanded for the imposition of a sentence other than death. The conviction of defendant Stamps is reversed, and his case is remanded for a new trial so that he may have the theory of not guilty by reason of insanity considered by the jury. The retrial shall be conducted in a manner consistent with our discussion of other allegations of error set forth above.

*Affirmed in part and reversed*
*in part and remanded.*

MR. CHIEF JUSTICE UNDERWOOD, dissenting:

As I understand the majority opinion, it requires production of certain white cards containing summaries of rough notes of pretrial conversations had by investigating personnel with prosecution witnesses despite the fact that these summaries cannot be said to be either verbatim or substantially verbatim statements of those witnesses. In my judgment this new construction which the majority places upon our criminal discovery procedure and its retroactive application to a case tried years earlier are unwarranted, without support in our earlier decisions and directly contrary to our present Rule 412.

Ever since *People v. Wolff*, 19 Ill.2d 318, in which this court said at page 323: "All authorities examined agree that use of documents produced under the rule is restricted to impeachment, thus it is held that only

statements or reports which could properly be called in the witness's own words should be made available to the defense", this court has adhered to a rule which gave defendants access to statements of prosecution witnesses only where the State intended to call such persons as witnesses at the trial and the documents were verbatim or substantially verbatim statements of the witness. Resolution of questions whether a given document was in the witness's own words or substantially so was entrusted to the judge. And it is precisely this rule which was adopted by this court in Rule 412 and announced as a part of our criminal discovery rules which became effective October 1, 1971. The policy decisions involved in determining the scope of that rule had been thoroughly debated by the Committee on Discovery and Procedure Before Trial in Criminal Cases appointed by this court. The court was thoroughly conversant with the arguments in favor of expanding the rule to include memoranda summarizing the oral statements of witnesses, and the arguments for restricting production to verbatim or substantially verbatim statements of the witness. Rule 412 represented our considered judgment to retain the "verbatim or substantially verbatim" limitation, and the reasons which then persuaded me to vote for that limitation are equally, if not more, persuasive at the present time.

It is even more surprising to me that a change of this magnitude occurs in the form of *dicta,* acknowledged by the majority in the statement that "the testimony of the witnesses interviewed was not required to prove the defendants guilty on the accountability theory."

The majority, in quoting from *Wolff,* has completely overlooked the fact that the entire opinion in that case was bottomed upon the premise, quoted above, that only verbatim or substantially verbatim statements were considered producible. Likewise, the majority's citation of *People v. Sumner,* 43 Ill.2d 228, overlooks the fact that the F.B.I. reports of interviews there involved were

established by the testimony of the Bureau agents to be substantially verbatim transcriptions of the conversations with the witnesses.

It is, in my judgment, fundamentally unfair to a witness to permit his impeachment by prior statements not shown to be substantially in the witness's own words. The United States Supreme Court in *Palermo v. United States*, 360 U.S. 343, 3 L. Ed. 2d 1287, 79 S. Ct. 1217, emphasized these reasons in discussing the policy motivating inclusion in the Jencks Act (18 U.S.C. sec. 3500) of the "substantially verbatim" requirement: "*** it was felt to be grossly unfair to allow the defense to use statements to impeach a witness which could not fairly be said to be the witness' own rather than the product of the investigator's selections, interpretations and interpolations." (360 U.S. at 350.) "It was important that the statement could fairly be deemed to reflect fully and without distortion what had been said ***. Distortion can be a product of selectivity as well as the conscious or inadvertent infusion of the recorder's opinions or impressions." (360 U.S. at 352.) The Committee on Pretrial Proceedings of the American Bar Association Project on Standards for Criminal Justice in formulating section 2.1(a)(i) of its Standards Relating to Discovery and Procedure Before Trial apparently found these reasons persuasive, for it also limits production to "relevant written or recorded statements" of witnesses.

Those reasons are particularly relevant here. The purpose in requiring production is to permit impeachment of a witness whose testimony at trial differs from his earlier statement, and the customary method of accomplishing that purpose is to lay a foundation by first inquiring of the witness whether he had, at the earlier time and place made the contradictory statement under the described circumstances. It would be difficult, confusing and in some instances impossible to lay that foundation unless the document provided the defense includes the

witness's earlier statement in verbatim or substantially verbatim terms. Likewise it is manifestly unfair to any witness to permit his impeachment on the basis of a summary of the witness's statements prepared in the words of the author of the summary. And that unfairness is compounded here where the "white cards" now to be given defendant are in fact a summary of an original sheet of notes which were themselves only "rough notes."

If the majority's reason for requiring production of the summaries is that the "yellow sheets" upon which the original "rough notes" were written have been destroyed by the State, it would, in my opinion, be far preferable to simply say so. As matters now stand, Rule 412 and our earlier decisions require statements to be verbatim or substantially so before their production may be ordered; the majority opinion appears to eliminate that requirement. The answers to questions which arise in almost every criminal case ought not to be left by this court in such a confusing state.

The majority opinion also finds that defendant Stamps must be given a new trial for failure of the court to provide the jury with appropriate verdict forms. I cannot agree. The jury was provided with two verdict forms—guilty and not guilty. While it would have been desirable for the jury to have been given a special verdict form of not guilty by reason of insanity including a verdict form indicating whether the defendant had recovered, the failure to give it in this case is not reversible error.

Section 115—4(j) of the Code of Criminal Procedure (Ill. Rev. Stat. 1965, ch. 38, par. 115—4(j)) in force at the time of the trial indicates that a special verdict form of not guilty by reason of insanity should be provided the jury where the affirmative defense of insanity has been presented at the trial. The defense tendered an instruction which included a verdict form indicating whether the defendant had or had not recovered from insanity but failed to tender an instruction in the proper form as contemplated

by section 115—4(j) in that no special jury verdict form of "not guilty by reason of insanity" was offered. Defendant later objected to the State's instructions for their failure to include such a form, but the defendant never tendered such an instruction himself. The defendant knew what the proper form was, but insisted on offering his own incomplete instruction and then later objected to the State's instructions for failure to include a proper form but still made no offer of such a form himself. In these circumstances, it seems anomalous for the defendant to complain of the failure to give a special verdict form.

In addition, defendant's instructions No. 38 and No. 50, which were given, state respectively that if the State has not proved beyond all reasonable doubt that defendant was sane at the time of the commission of the acts, then defendant should be found not guilty; and that if defendant was not able to distinguish right from wrong and could not control his actions accordingly then he should be acquitted on the ground of insanity. The jury was then fully aware that defendant should not be convicted if he was insane, and was so instructed. Had the jury accepted defendant's defense of insanity, it must be assumed they would have rendered a verdict of not guilty since they had been so instructed. Their return of a general verdict of guilt indicates a rejection of Stamps' defense of insanity and renders unnecessary any determination whether defendant had or had not recovered from his alleged insanity.

I would affirm the judgments, remanding only for resentencing of those defendants who received the death penalty.

MR. JUSTICE WARD, also dissenting:

I would join in the Chief Justice's dissent from the majority's position relative to the production of the cards.