THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
JOHN WILLIAM STAMPS (Impleaded), Defendant-Appellant.

Fourth District   No. 13663

Opinion filed September 12, 1977.

Richard J. Wilson and Richard E. Cunningham, both of State Appellate Defender's Office, of Springfield, for appellant.

William A. Schuwerk, Jr., State's Attorney, of Chester (Robert C. Perry and Marc D. Towler, both of Illinois State's Attorney's Association, of counsel), for the People.

Mr. JUSTICE REARDON delivered the opinion of the court:

The defendant, John William Stamps, appeals his convictions for six counts of murder in violation of section 9—1 of the Criminal Code of 1961 (Ill. Rev. Stat. 1965, ch. 38, par. 9—1), and the three concurrent 100- to 200-year sentences of imprisonment imposed thereon which were to begin at the expiration of a prior 25-year sentence for murder.

On November 23, 1965, the defendant allegedly participated in a prison riot at the Menard Penitentiary in which three prison guards were stabbed to death. Murder charges against the defendant and three other prisoners were filed in Randolph County, but on a motion for change of venue to Sangamon County, the trial was held in Springfield. The defendant was convicted and originally sentenced to death but was granted a new trial after appealing to our supreme court. *People v. Bassett* (1974), 56 Ill. 2d 285, 307 N.E.2d 359.

It is from that retrial that this appeal is prosecuted. Essentially, defendant alleges: (1) that the State was "grossly negligent" in failing to produce narrative-form notes of prisoner statements which were given to the State after the riot; (2) that defendant's sanity was not proved beyond a reasonable doubt; (3) that the court abused its discretion in excluding testimony concerning homosexual activity at the penitentiary; (4) that unchallenged portions of the State's closing argument deprived defendant of a fair trial; (5) that three of defendant's six convictions should be vacated because there were only three victims; and (6) that the sentences imposed herein should not be consecutive to the 25-year sentence which defendant is already serving.

In *People v. Payne* (1976), 44 Ill. App. 3d 502, 358 N.E.2d 409, this court held that the suppression of evidence that was material and favorable to the defense demands the granting of a new trial. In *Payne*, the prosecutor inadequately responded to a discovery motion by failing to produce a police officer's final report containing a summary of an eyewitness' statements concerning a robbery of which the defendant was accused. The report was in the possession of the State. Accord, *People v. Parton* (1976), 40 Ill. App. 3d 753, 354 N.E.2d 12.

The instant case, however, is unlike *Payne* and *Parton*. Here, the defendant sought to dismiss the charges or, alternatively, to disallow the testimony of witnesses whose prior statements were summarized on white cards which the supreme court had already held to be discoverable. (*Bassett*, 56 Ill. 2d 285, 288-92, 307 N.E.2d 359, 360.) The cards, along with

the record of defendant's first trial, were stored in 14 filing cabinets in the basement of the Supreme Court Building prior to the time that the Attorney General's present building was constructed. Although the defendant has accused the State of being grossly negligent in failing to preserve the white cards, the record in this appeal reflects that the cards and other materials from the first trial were preserved like other records of the Attorney General. The only fact which possibly indicates negligence on the part of the State is that the files were not locked while being stored by the Attorney General.

Edmund Heyer, a State police investigator, testified that he stored the cards and records in the basement of the Supreme Court Building at the conclusion of the first trial. Heyer later learned that the material was transferred to the Attorney General's new building in 1970, but when he went there to find the material he discovered only one file cabinet containing part of the record. Heyer contacted the special Assistant Attorney General who prosecuted the first trial and then he searched the Attorney General's Chicago office without success in finding the cards.

■■ The guarantee of due process is to secure a fair trial for those accused of crime, not to punish the State for its failure to preserve voluminous papers for extended periods of time. (*People v. Dixon* (1974), 19 Ill. App. 3d 683, 686, 312 N.E.2d 390, 393.) In *United States v. Bryant* (D.C. Cir. 1971), 439 F.2d 642, three defendants, Bryant, Turner, and Johnson, had been convicted of offenses involving the sale of heroin. The sale was made to Pope, an undercover agent for the Bureau of Narcotics and Dangerous Drugs. Pope, the principal witness for the prosecution, testified at the trial that he and Johnson made the general arrangements in Pope's motel room for the sale of the heroin to Pope. On the following day, according to Pope, Johnson and Bryant visited Pope at his motel room. After some negotiations, Bryant approved the sale of a particular quantity of heroin at a particular price. Later the same day, Johnson, accompanied by Turner, came to Pope's motel room. According to Pope, the three of them had a general conversation about the narcotics business at that time. The three went to Johnson's home to pick up the heroin and subsequently returned to Pope's motel room, where payment was made. During the various conversations occurring in Pope's room, other government agents were in the next room listening and making a tape recording of the transaction.

The defense sought to discover the tape recording. The prosecution admitted that a tape had been made, but stated that it had been lost at the Bureau of Narcotics and Dangerous Drugs. At the hearing on the defense motion to discover the tape, the agent in charge of the taping admitted that he had made no effort to preserve the tape or to consult a superior

regarding his decision not to preserve it. The prosecution attempted to establish at trial that Bryant aided and abetted in Johnson's sale of the heroin.

In remanding for a determination as to the imposition of sanctions upon the government for failing to comply with discovery, the court stated:

"[*United States v. Augenblick* (1969), 393 U.S. 348, 89 S. Ct. 528, 21 L. Ed. 2d 537,] not only makes clear that the circumstances of the tape's disappearance in these cases should be relevant to the question of proper sanctions. It also suggests that, while sanctions should be imposed in cases of bad faith suppression of evidence, an exception will be made for good faith loss * * *. An exception for good faith loss of important evidence must not be allowed to swallow the discovery rules, and the burden of explanation on the Government must be a heavy one; but criminal convictions otherwise based on sufficient evidence may be permitted to stand so long as the government made 'earnest efforts' to preserve crucial materials and to find them once a discovery request is made.

* * *

On remand here the District Court should weigh the degree of negligence or bad faith involved, the importance of the evidence lost, and the evidence of guilt adduced at trial in order to come to a determination that will serve the ends of justice." 439 F.2d 642, 651-53.

On remand, the district court determined that the convictions must stand because the tapes were destroyed, were unintelligible, and because there was strong evidence tending to prove the defendants' guilt. *United States v. Bryant* (D. D.C. 1971), 331 F. Supp. 927, *aff'd* (D.C. Cir. 1971), 448 F.2d 1182.

In the instant case, our supreme court has expressly determined that the white cards were discoverable by the defendant. The record does not reflect that the State has deliberately suppressed those cards, rather, it reflects that they were somehow lost during the extended period of time that the Attorney General possessed them. The record clearly reflects that the cards were preserved by the Attorney General with the same degree of care that was accorded to other materials in his control. The extraordinary event of moving the Attorney General into a new building in 1970 may have been the actual cause for the loss, but there appears to be no way of verifying that fact with any degree of certainty. There is not a shred of evidence reflected in the record which indicates that the loss of the cards was the result of guile, stratagem, or craftiness, and, owing to the length of the period of storage, a period of approximately 10 years to the date of trial, we cannot say that the prosecutor acted in bad faith in storing the materials.

■■ The testimony of Officer Heyer clearly reflects that the State made an earnest effort to recover the cards once they were discovered to be missing. While we can only speculate as to the contents of the lost materials, we clearly cannot say that the evidence of defendant's guilt was closely balanced. It is our view that the cards would have had to contain extraordinary information in order to change the jury's verdict. In fact, however, all of the evidence presented against the defendant clearly points to his guilt, so we must say that the State's failure to preserve the cards was only harmless error in this case. Compare *Bryant* with *State v. Maloney* (1970), 105 Ariz. 348, 464 P.2d 793, *cert. denied* (1971), 400 U.S. 841, 27 L. Ed. 2d 75, 91 S. Ct. 82.

■■■ We do not condone the loss of the records in this case. The State obviously could and should have exercised greater control over the material, zealously protecting it from loss or destruction. The trial court carefully examined the available evidence concerning the loss here and determined that the State, although possibly negligent in some degree, had acted in complete good faith. As we have already stated, we agree with that determination. We wish to emphasize, however, that this court has and will in the future carefully scrutinize the records in such cases for evidence of bad faith where relevant materials are alleged to be lost or destroyed. A very heavy burden is on the State to explain its action or inaction and to establish its complete good faith.

■■ A reviewing court cannot disturb a jury's finding of sanity unless it is so manifestly against the weight of the evidence as to indicate that the verdict was based on passion or prejudice. (*People v. Grant* (1977), 46 Ill. App. 3d 125, 128, 360 N.E.2d 809, 812.) The jury is not required to accept the conclusions of a psychiatrist on the question of a defendant's sanity (*People v. Greenfield* (1975), 30 Ill. App. 3d 1044, 333 N.E.2d 36), but the weight of the psychiatrist's opinion is to be measured by the reasons given for the conclusion and the factual details supporting it. *People v. Burress* (1971), 1 Ill. App. 3d 17, 272 N.E.2d 390.

In the instant case, the State presented two psychiatrists who, in response to hypothetical questions, testified that defendant was sane at the time he allegedly committed the offenses. Prior to commission of the offenses, Dr. Meyer Kruglik diagnosed defendant as a sociopath who had no mental illness. On three occasions after the offenses were committed, Dr. C. T. Ciatteo examined the defendant and determined that he had a sociopathic personality. The State presented five lay witnesses who observed defendant at the time the offenses were committed and they were all of the opinion that defendant was sane at that time. A sixth witness, Ross Randolph, the Director of the Department of Public Safety, engaged in extensive negotiations with the defendant immediately after the murders and deemed him to be sane at that time. Three instructors

who observed the defendant each day during the month prior to the murders testified that they noticed nothing unusual about his behavior at that time.

The events leading up to and resulting in the murders establish a compelling foundation for the jury's finding of sanity. Planning for the riot was extensive and conducted considerably in advance by a number of persons, including the defendant. Two weeks prior to the riot, defendant approached inmate Charles Foster for the purpose of soliciting his aid in recruiting ten or twelve black rioters. Defendant informed Foster of the time and place and gave him instructions during the afternoon prior to the uprising. A bomb and homemade knives or "shivs" were prepared in advance. Defendant borrowed a supply of black electrical tape from inmate Jerrell Fortner for use in cushioning the handles of the homemade knives.

During the riot, defendant exhibited preferences or a selectivity in choosing which officers to attack. Defendant refrained from stabbing an officer who was well-liked by the prisoners, Officer Disky, despite their close proximity to each other during the uprising. Defendant also refrained from stabbing two of the officers who were taken as hostages, although witnesses did observe him stabbing Officers Gross and Paul who were not particularly well-liked. Defendant also appeared to be calm and rational when he led the inmates' negotiations with the authorities. Before appearing on television, defendant borrowed a comb to care for his hair. Before surrendering, defendant solicited numerous assurances that he and other inmates would not be harmed after their submission to custody.

■■ On the basis of the opinion testimony and the evidence in the record concerning the circumstances surrounding the crime, we, therefore, find that the jury was presented with sufficient evidence which justified its finding that defendant was sane at the time of the riot. We, accordingly, hold that the jury's finding was not against the manifest weight of the evidence.

■■ Defendant contends, in essence, that the court abused its discretion in excluding the transcripts of testimony given by Ronald Riley and Thomas Sumner at the first trial. Both witnesses would have testified concerning the prevalence of homosexual activity at the prison. It is alleged that the testimony would have rebutted the testimony of Ross Randolph concerning the relative insignificance of the homosexual activity at the prison. The court, however, excluded the testimony on the ground that there was nothing to show that the defendant had any knowledge of the activities to which the witnesses would testify. We agree with that conclusion of the trial court, however, it is also evident that homosexuality has never been equated in this State with a mental disease or defect so that the testimony cannot be said to be relevant to the

issue of defendant's alleged insanity. *E.g., People v. Parisie* (1972), 5 Ill. App. 3d 1009, 1034-35, 287 N.E.2d 310, 325.

Defendant contends that the closing argument of the State was replete with prejudicial comments which deprived him of a fair trial. Those statements, troubling as they are to defendant on appeal, were not objected to at trial. In addition, all of the alleged errors except one concerning the State's reading to the jury from the trial transcript were not preserved in a specific post-trial motion.

■■■ A defendant's failure to make a timely objection to allegedly prejudicial comments uttered on behalf of the State waives error unless those comments constitute plain error. (*People v. Kelly* (1974), 22 Ill. App. 3d 111, 115-16, 316 N.E.2d 777, 780; *Greenfield.*) In addition, a reviewing court may, as a matter of grace in a case involving the deprivation of life or liberty, notice errors which have denied a fair and impartial trial for the defendant or where the evidence has been closely balanced even though the errors have not been preserved in a specific post-trial motion. (*People v. Pickett* (1973), 54 Ill. 2d 280, 283, 296 N.E.2d 856, 858.) Here, we cannot say that the conditions set forth in *Kelly, Greenfield, and Pickett* have been met. We, accordingly, find that the defendant waived the errors which are allegedly contained in the State's closing argument.

The trial court entered judgment on each of the six counts contained in the indictment charging the defendant with the murders of Lewis M. Paul, Arthur L. Kisro, and George L. Wilson, although the court only imposed three concurrent 100- to 200-year sentences of imprisonment. Counts I and II charge the murder of Paul, counts III and IV charge the murder of Wilson, and counts V and VI charge the murder of Kisro.

■■ Recently, our supreme court stated that when more than one offense arises from a single series of closely related acts and when the offenses, by definition, are not lesser included offenses, convictions having concurrent sentences may be entered. (*People v. King* (1977), 66 Ill. 2d 551, 562, 363 N.E.2d 838, 845.) The defendant in the instant case was, therefore, properly convicted and concurrently sentenced for the three separate murders of Paul, Wilson, and Kisro. The defendant, however, cannot be convicted twice for the same offense.

The statute defining the offense of murder employed the same language in 1965 as it did at the time of trial. It stated:

"*Murder* (a) A person who kills an individual without lawful justification commits murder if, in performing the acts which cause the death:

(1) He either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another; or

(2) He knows that such acts create a strong probability of death or

great bodily harm to that individual or another; or (3) He is attempting or committing a forcible felony other than voluntary manslaughter." Ill. Rev. Stat. 1965, ch. 38, par. 9—1.

■■ Since counts I, III, and V did not allege that the acts causing death had occurred while the defendant was attempting or committing a forcible felony, the indictment had to allege that the defendant either intended or knew that the acts he was performing would cause death or great bodily harm in order to be sufficient to charge an offense of murder. (*People v. Cesarz* (1969), 44 Ill. 2d 180, 189, 255 N.E.2d 1, 6-7; *People v. Martinez* (1972), 4 Ill. App. 3d 1072, 283 N.E.2d 268, 271.) Since these counts failed to allege any intent or knowledge on the part of the defendant, they were fatally defective and it was error for the court to impose judgment of conviction upon them.

■■ For the reasons expressed in *People v. Goffman* (1976), 65 Ill. 2d 296, 357 N.E.2d 483, we hold that the court did not err in imposing three concurrent 100- to 200-year sentences of imprisonment which were to begin at the expiration of defendant's present 25-year sentence for murder.

For all of the foregoing reasons, we affirm defendant's murder convictions entered on counts II, IV, and VI of the indictment and we vacate the convictions entered on counts I, III, and V. The concurrent sentences of 100 to 200 years which are to begin at the expiration of defendant's present sentence are affirmed.

Affirmed in part, reversed in part.

GREEN, P. J., and LEWIS, J., concur.