THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ANTHONY McGEE, Defendant-Appellant.

Second District   No. 79-285

Opinion filed September 17, 1980.

Mary Robinson and Paul J. Glaser, both of State Appellate Defender's Office, of Elgin, for appellant.

Dennis P. Ryan, State's Attorney, of Waukegan (Phyllis J. Perko and Marshall Stevens, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE NASH delivered the opinion of the court:

Following a jury trial, Anthony McGee was found guilty of rape (Ill. Rev. Stat. 1977, ch. 38, par. 11—1) and sentenced to a term of six years' imprisonment. Defendant appeals, asserting that the trial court erred in three respects: First, that he was not proved guilty beyond a reasonable doubt. Second, that prejudicial error occurred when the prosecution was permitted to cross-examine defense witnesses as to their belief as to the veracity of certain of the State's witnesses. Third, that the trial court abused its discretion in excluding expert testimony concerning an absorption inhibition test performed upon vaginal aspirate removed from the victim, which purported to show that defendant could not have been the assailant.

The testimony adduced at trial disclosed that between 3:05 p.m. and 3:25 p.m. on May 19, 1978, the 17-year-old victim was raped inside the Knights of St. John Hall in Waukegan. At about 3:20 p.m. that day, Diane Lopez and another friend arrived at the hall according to a pre-arranged agreement with the victim. Upon approaching the hall, Lopez noticed that the door was slightly ajar, saw the victim's bicycle inside and papers strewn about the floor. She called the victim's name and walked further into the hall, where she saw the victim and a man behind the bar in a back room. The victim screamed and yelled for Lopez to call the police. Lopez saw the man from the waist up for about one minute. Shortly thereafter the victim had gotten away from the man, who was in the corner dressing. The two women then ran from the hall and called the police.

The descriptions given by both women of the assailant are similar, but did differ in some respects. Both had told various officers that the man was a Negro, about 21 years old, but they each gave descriptions of his height as being between 5 feet 7 inches and 6 feet and each woman gave a different description of his height at some point during the investigation. They said that the man wore dark pants, either blue or black and a flowered shirt; although they gave descriptions of the colors of the shirt at different times as blue or brown flowered, blue or brown flowers on a white background, or white flowers on a blue background. The victim

said that the man had a beard and mustache which surrounded his mouth and continued to a point about one inch from his sideburns. She also testified that the man she identified later in photographs, at a lineup and the defendant as he appeared at trial, all appeared to have less facial hair than her attacker. Lopez, however, did not notice much facial hair but she did remember a mustache, although she could not describe it. The victim said her attacker wore blue or blue tinted glasses, but Lopez said she never saw any glasses either on the man or at the scene. Lopez also noticed a silver bracelet on his wrist which was partially covered by his sleeve. The victim did not recall any bracelet.

On May 22, 1978, the victim was shown six photographs and identified William Terry, a friend of the defendant's, as her attacker. On May 23, 1978, she was shown the same six photographs along with an additional photograph of defendant and this time she identified defendant. Lopez, independently of the victim, selected the same photograph. Both women were again shown the same group of photographs on June 2, 1978, shortly before they independently identified defendant from a six-man lineup. None of the men depicted in the photographs, other than defendant, participated in the lineup.

Defendant's barber of eight years, his mother, a local school principal who had known defendant for 10 years, and William Terry, defendant's friend of seven years, all testified that defendant had never worn his facial hair in the manner described by the women. Each of these witnesses also testified that defendant enjoyed a good reputation for being a peaceful and law-abiding person.

William Terry testified that he was with the defendant until about 4 p.m. on May 19, 1978, one half hour after the rape occurred, and then drove defendant home which was one mile from the scene. He also testified that papers found at the scene with Terry's name on them had been in his car that day during the period defendant and other persons had been riding with him and that the car also had been parked on the street, which defendant asserts presented an opportunity for others to obtain the papers. Defendant's testimony was substantially the same as Terry's, and he denied committing the offense.

During cross-examination of Terry the State, over defense objection, was permitted to ask him whether a police officer was lying or mistaken when he testified that Terry had told him that defendant was the only person who had access to the papers in Terry's car. The same question, over defense objection, was asked Terry concerning testimony of the officer that Terry had told him defendant was not always with him during the afternoon of May 19, 1978. Similar questions, again over defense objection, were posed to the defendant concerning the testimony of the victim and Lopez.

Irwin Havland, a senior technician with the Northern Illinois Police Crime Laboratory, examined vaginal aspirate which had been taken from the victim on May 19, 1978, and testified that semen was present. He also testified that the vaginal aspirate had been kept in a small vial and refrigerated prior to conducting his tests in early June 1978. He further testified that the vial needed to be refrigerated to prevent bacterial contamination, which could begin after 8 to 10 hours at room temperature. As a part of his test, he had opened the vial for 10 minutes and diluted the contents with sterile water; the vial was resealed but it was not refrigerated after his tests were completed.

The State sought to exclude testimony of an expert witness who had examined the vaginal aspirate at the request of defendant. At the hearing of the State's motion in limine evidence was introduced that in November 1978 Emmett Harmon, a clinical chemist at Oak Park Hospital and a director of the Glen Ellyn Laboratory, conducted an absorption inhibition test on the vaginal aspirate contained in the vial; it is a serological test which can detect the presence of antigens in blood, saliva, semen and other bodily fluids and determine blood type. Approximately 80 percent of the population secrete antigens in their saliva or semen and, if a person is a secretor, the antigens which indicate blood type will normally be present in the saliva or semen tested. Prior to conducting his test, Harmon ascertained that defendant had type B blood and that he was a secretor of type B antigens in his saliva and semen. He testified that when he examined the vaginal aspirate he looked only for the presence of type B antigens and found none; he did not look for the presence of any other type of antigen in the material tested.

Leslie Dean, a chemist at the Northern Illinois Police Crime Laboratory, testified in the limine hearing that although the absorption inhibition test has been used for several years, it is subject to inaccurate results which can be caused by mistakes in procedure, bacterial contamination, and the nature of the substance tested. She did not, however, state that the test was not generally accepted in the scientific community and noted that she had conducted the test 5 to 15 times, although on occasion she obtained an "inconclusive" result where she could not say anything about the sample. Emmett Harmon further testified that serological testing is accepted in the scientific community and is used generally. Harmon stated he had performed this type of test 50 to 75 times, including 8 or 9 tests of seminal fluids, and had testified in court 5 or 6 times regarding serological testing. See *People v. Boerckel* (1979), 68 Ill. App. 3d 103, 106, 385 N.E.2d 815, 818, *cert. denied* (1980), ___ U.S. ___, 64 L. Ed. 2d 861, 100 S. Ct. 2998; *People v. Moore* (1978), 61 Ill. App. 3d 694, 378 N.E.2d 516.

Although Dean and Harmon agreed that bacterial contamination of the sample was possible and that such contamination would render any test inaccurate, they disagreed as to the presence of a sufficient amount of contamination in this sample which would invalidate the results of Harmon's test. Dean testified that, in her opinion, it was very likely that a vial opened in June for 10 minutes, diluted with sterile water, then sealed, but left unrefrigerated for 4 months would be contaminated to such an extent that any test would be inaccurate. She also stated that although she had never tested vaginal aspirate to determine how long it could remain stable, it had been documented that bacteria incubated at 40-50°F for 24 hours could "radically" change such a sample. She also testified that the degree of contamination which would destroy the reliability of a serological test depended upon the type of test done and the sample tested and in order to determine whether a particular sample was sufficiently contaminated to invalidate a test, it would have to be examined. Although Dean did not examine the sample involved in this case, she testified that it was very likely that over the six-month period from the recovery of the sample until Harmon's test, bacteria could have affected the antigens. Dean concluded it was very unlikely, but possible, that a test conducted under the circumstances of this case would produce accurate results.

Harmon testified that his examination of the vial with a hand lens disclosed no "obvious" bacterial contamination, nor was there any abnormal smell, and he concluded that the sample was not "heavily" contaminated. He also testified that the sample could have been contaminated but that antigens in body fluids could remain stable for long periods of time. The trial court granted the motion in limine excluding from the trial of the case all of Harmon's testimony and any reference to the results of his test on the grounds that (1) the test was not one accepted in the scientific community and, (2) that even if accepted the delay in performing the test presented so much opportunity for contamination of the sample that the results would be inaccurate.

We will consider first defendant's contention that the trial court erred in excluding expert testimony regarding the absorption test performed upon vaginal aspirate removed from the victim.

■■ In reaching its determination that the results of the test must be excluded as the test was not one which was accepted in the scientific community the trial court had before it little evidence to support that conclusion. The State's witness did not so testify but merely noted such a test sometimes produces inaccurate results because of incorrect procedures or contamination of the material tested. The defendant's expert witness, however, stated it was an accepted test. It appears to be a proce-

dure regularly undertaken to determine blood type. (See *People v. Boerckel* (1979), 68 Ill. App. 3d 103, 385 N.E.2d 815, *cert. denied* (1980), ____ U.S. ____, 64 L. Ed. 2d 861, 100 S. Ct. 2998; *People v. Moore* (1978), 61 Ill. App. 3d 694, 378 N.E.2d 516; *People v. Kemp* (1961), 55 Cal. 2d 458, 359 P.2d 913, 11 Cal. Rptr. 361, *cert. denied* (1961), 368 U.S. 932, 7 L. Ed. 2d 194, 82 S. Ct. 359; *McGilvery v. State* (Tex. Crim. App. 1976), 533 S.W.2d 24; *State v. Bowen* (1969), 104 Ariz. 138, 449 P.2d 603.) In *Bowen v. Eymen* (Ariz. 1970), 324 F. Supp. 339, the court found error in the failure to appoint, at court expense, an expert to conduct a test to determine if defendant's blood type was present in the vagina of the victim and noted that the fact "[t]hat a comparison of the blood types could have negated guilt is not disputed herein and is supported by ample authority." (324 F. Supp. 339, 340; see also 65 Am. Jur. 2d *Rape* §61 (1972).) We conclude that on the evidence before it the trial court erred when it found that antigen testing was not generally accepted in the scientific community.

We next consider whether the testimony adduced at the hearing of the motion in limine was sufficient to support the trial court's secondary conclusion that the circumstances under which this test was conducted rendered its results inaccurate and required its exclusion.

The expert witnesses were in conflict on this question. Although she had not examined or tested the sample in issue, Leslie Dean expressed the opinion that it was very likely it was so contaminated by bacteria as to produce inaccurate results. Emmett Harmon, however, did examine the sample and he found no evidence of "heavy" contamination. In *People v. Ripa* (1980), 80 Ill. App. 3d 674, 399 N.E.2d 1000, this court found it was not error to refuse to permit an expert witness to challenge the conclusiveness of a chemical test he had not performed. Defendant contends that under *Ripa*, the trial court could have excluded Dean's testimony in rebuttal had Harmon been permitted to present his results. Hence, defendant argues, her testimony based as it was only on the probabilities of contamination affecting the results of the test was of little value.

We note that Dean acknowledged that the particular sample would have to be examined before a prediction could be made of the effect any bacterial contamination might have on the reliability of the test. Although Harmon's statement that the aspirate was not "heavily" contaminated implies that some bacteria was present, there was no testimony that the quantity of bacteria which was present was sufficient to affect the outcome of the test; nor was there any testimony that the methods Harmon employed to detect bacteria were inadequate.

It appears from the comments of the trial judge that he was concerned that the results of this test may have been so unreliable as to

destroy its probative value and would mislead the jury. That possibility could well have arisen because of the impreciseness of the testimony of the expert witnesses and the failure of the attorneys to closely examine them as to the tests and testing procedures under consideration. Counsel for defendant characterized Harmon's conclusion as a "positive-negative"; that is, Harmon tested only for the presence of antigens which might suggest defendant's blood type was present and found none in the sample. Whether the sample was in a condition which would permit identification of any antigens, if present, was not explored. Certainly, if the witness had looked and had found antigens establishing a blood type different than that of defendant and the victim, such evidence would have greatly enhanced the defense. Dean testified that the results of similar tests were sometimes "inconclusive" and under certain circumstances bacterial action effected a "radical" change in a test sample. Neither expert, however, was called upon to explain whether a sample which had been so changed would, when tested, prevent identification of any antigens, change the composition of antigens present or otherwise bring about an untrustworthy result. See generally 12 Am. Jur., Proof of Facts §13 (1962).

■■ In view of the inconclusive nature of the testimony we can understand the trial court's reluctance to submit potentially misleading evidence to the jury. On the basis of the record before us, however, we must find that the trial court's decision to exclude Harmon's testimony on the grounds the test sample was contaminated to be against the manifest weight of the evidence. While the jury would have been free to reject Harmon's testimony, as it is free to disregard the testimony of any expert (see *People v. Stamps* (1977), 52 Ill. App. 3d 320, 367 N.E.2d 543), this evidence, if believed by the jury, could have resulted in defendant's acquittal. Accordingly, defendant's conviction must be reversed and this cause remanded for a new trial.

■■ As this case must be retried, we need not consider in detail defendant's contention prejudicial error occurred during the State's examination of defense witnesses. It was error for the State to ask these witnesses whether certain officers lied when they testified. (See *People v. Riley* (1978), 63 Ill. App. 3d 176, 379 N.E.2d 746; *People v. Spates* (1978), 62 Ill. App. 3d 890, 379 N.E.2d 869; *People v. Hill* (1978), 58 Ill. App. 3d 822, 374 N.E.2d 1020; *People v. Hicks* (1971), 133 Ill. App. 2d 424, 273 N.E.2d 450.) We are confident this improper tactic will not be condoned by the trial court on retrial.

Although this case will be remanded for a new trial we also have reviewed the evidence adduced at trial and determine it was sufficient to support defendant's conviction. (See *People v. Taylor* (1979), 76 Ill. 2d 289, 391 N.E.2d 366.) In doing so we have considered the testimony of the

454

victim and the second witness who identified defendant as the assailant, together with the testimony of the other witnesses.

For the reasons we have discussed the judgment of conviction will be reversed and this cause is remanded for a new trial.

Reversed and remanded.

SEIDENFELD, P. J., and LINDBERG, J., concur.